# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00289-CV

**Ryan R. Grant (individually, and as trustee of the Ryan R. Grant 2007 Trust); Laura Grant; Jana Grimes; John E. Grimes (trustee of the John E. Grimes 2007 Trust); Anne Fielding; Scott Sizemore; John D. Rowell; Herschel Sova; Britta Butler; Nathan Tart; Kristin Hunninghake; Susan Robb; Robert Arnett; Claire Gregory; Danna Stedman; Sue Hawk; Blaine Matte; Russell Harris; Ashley Ambroso; Julianne Primeaux; Briana Burt; Kiera Talbott; Marc Ferrari; David Morales; James Friedrich; Jeremy Kling; GTS Technology Solutions, Inc. (formerly ARC Government Solutions, Inc. and Austin Ribbon & Computer Supplies, Inc.), Appellants**

v.

**Pivot Technology Solutions, Ltd.; Pivot Acquisition Corp.; and ARC Acquisition (US), Inc., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. D-1-GN-16-005731, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## O P I N I O N

The appellants (collectively, the "GTS Defendants") appeal from an order signed by the trial court on April 17, 2017, denying their motion to dismiss filed pursuant to the Texas Citizens Participation Act (TCPA). *See* Tex. Civ. Prac. & Rem. Code §§ 27.003 (TCPA motion to dismiss), 51.014(a)(12) (authorizing interlocutory appeal of order denying motion to dismiss filed under TCPA section 27.003). In two issues, the GTS Defendants challenge the trial court's determinations (1) that the GTS Defendants failed to carry their burden to show that the plaintiffs' "legal action is based on, relates to, or is in response to" conduct protected by the TCPA, and (2) alternatively, that the plaintiffs satisfied their burden under the TCPA to establish by "clear and specific evidence

a prima facie case for each essential element" of their claims. *See id.* § 27.005. For the reasons that follow, with the exception of certain claims made by the Pivots' Plaintiffs based on improper solicitation and competition, we conclude that the trial court erred in denying the motion to dismiss and will reverse, in part, the trial court's order and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

GTS Technology Solutions, Inc. ("GTS") is a technology solutions and consulting business certified by the State of Texas as a Historically Underutilized Business (HUB).[1] *See generally* Tex. Gov't Code §§ 2161.001-.253 ("Historically Underutilized Businesses"). In general, GTS's status as a HUB allows it to compete for state purchasing and public works contracts with state and local governments that give preferential treatment to businesses that have been certified as HUBs. *See id.* §§ 2161.181-.182 (requiring state agencies to make "good faith effort" to increase contract awards for goods or services and construction contract awards that agency expects to make during fiscal year to HUBs). According to GTS, its "core business depends on its status as a

---

[1] "Historically underutilized business" means an entity with its principal place of business in this state that, generally, is owned by one or more "economically disadvantaged persons" who actively participate in the business's control, operation, and management. Tex. Gov't Code § 2161.001(2). "'Economically disadvantaged person' means a person who (A) is economically disadvantaged because of the person's identification as a member of a certain group, including: (i) Black Americans; (ii) Hispanic Americans; (iii) women; (iv) Asian Pacific Americans; (v) Native Americans; and (vi) [veterans]; and (B) has suffered the effects of discriminatory practices or other similar insidious circumstances over which the person has no control." *Id.* § 2161.001(3). Whether a business operating in Texas qualifies as a HUB is determined and certified by the Texas Comptroller of Public Accounts. *Id.* §§ 2161.061 (commission certification of historically underutilized businesses), .0011 (powers and duties under chapter 2161 transferred to comptroller).

2

HUB[, and] the vast majority of GTS's revenue derives from several master purchasing contracts it was awarded by the Texas Department of Information Resources."

In August 2011, GTS entered into an Asset Purchase Agreement with another technology-related business, ARC Acquisition ("Acquisition"), a subsidiary of Pivot Technology Solutions, Ltd. ("Pivot").[2] Neither Acquisition nor Pivot is, or ever has been, certified as a HUB. The Asset Purchase Agreement provided for the sale of certain assets by GTS to Acquisition, but expressly excluded from the sale "those contracts, and assets related thereto, set forth in Section 2 which relate to the operation of a 'Historically Underutilized Business.'" At the time of the Asset Purchase Agreement, the shareholder owners in GTS included Ryan R. Grant as trustee for "the Ryan R. Grant 2007 Trust." In connection with Acquisition's purchase of the GTS assets, Ryan Grant was hired as president of Acquisition.

In the years following execution of the Asset Purchase Agreement, the business relationship between GTS and Acquisition deteriorated. On November 23, 2016, Acquisition, Pivot, and Pivot Acquisition Corp. (collectively, the "Pivot Plaintiffs") sued the GTS Defendants, including Ryan Grant and his wife Laura Grant, for breach of contract, tortious interference, breach of fiduciary duty, fraud, unjust enrichment, conversion, theft, misappropriation of trade secrets, civil conspiracy, unfair competition, and harmful access by computer. The Pivot Plaintiffs allege that Ryan Grant used his position at Acquisition to acquire confidential information and then engaged in a series of actions designed to benefit GTS and to cause harm to Acquisition.

---

[2] According to the Pivot Plaintiffs, Acquisition is in the business of "selling and marketing computers, computer-related products and peripherals, as well as providing computer-related services."

In response, the GTS Defendants filed a motion to dismiss pursuant to the Texas Citizens Participation Act. *See* Tex. Civ. Prac. & Rem. Code § 27.003(b). Following a hearing, the trial court denied the motion. This appeal followed. *See id.* § 51.014(a)(12).

**THE TEXAS CITIZENS PARTICIPATION ACT AND STANDARD OF REVIEW**

Chapter 27 of the Texas Civil Practice and Remedies Code, also known as the Texas Citizens Participation Act (TCPA or the "Act"), is often characterized as an anti-SLAPP statute, meaning a statute designed to limit "Strategic Lawsuits Against Public Participation." *See id.* §§ 27.001-.011; *Serafine v. Blunt*, 466 S.W.3d 352, 366-67 (Tex. App.—Austin 2015, no pet.) (Pemberton, J., concurring) (explaining anti-SLAPP concerns revealed in TCPA's legislative history). "The purpose of the [Act] is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002 ("Purpose"). "To effectuate the statute's purpose, the Legislature has provided a two-step procedure to expedite the dismissal of claims brought to intimidate or to silence a defendant's exercise of these First Amendment rights." *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017); *see* Tex. Civ. Prac. & Rem. Code §§ 27.003 ("Motion to Dismiss"), .005 ("Ruling").

Under the first step, a movant seeking to prevail on a motion to dismiss under the TCPA has the burden to "show[] by a preponderance of the evidence that the [nonmovant's] legal action is based on, relates to, or is in response to the [movant's] exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association." Tex. Civ. Prac. & Rem. Code § 27.005(b).

4

Although the stated purpose of the TCPA is to "encourage and safeguard [certain] constitutional rights," it is now well-established that the plain language of the statutory definitions of the terms "exercise of the right of free speech," "exercise of the right to petition," and "exercise of the right of association" does not limit application of the Act to constitutionally protected conduct. *See Cavin v. Abbott*, 545 S.W.3d 47, 61-63 (Tex. App.—Austin 2017, no pet.) ("Any notion that courts should read implicit limitations into the TCPA definitions derived from broader statutory or jurisprudential context has been put to rest by the Texas Supreme Court's precedents." (discussing *ExxonMobil Pipeline*, 512 S.W.3d at 899-902, and *Lippincott v. Whisenhunt*, 462 S.W.3d 507 (Tex. 2015))); *Elite Auto Body, LLC. v. Autocraft Bodywerks, Inc.,* 520 S.W.3d 191, 193 (Tex. App.—Austin 2017, pet. dism'd) (explaining that "'communications' protected by TCPA . . . are not confined solely to speech that enjoys constitutional protection"); *see also Serafine*, 466 S.W.3d at 377-79 (Pemberton, J., concurring) (discussing implications of construing TCPA without regard to stated purpose of Act or to technical meanings of phrases under constitutional jurisprudence).

The Act defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code § 27.001(3). Similarly, the Act defines "exercise of the right to petition," in part, as a "communication in connection with an issue under consideration or review by a legislative, executive, judicial, other governmental body or in another governmental or official proceeding," as well as "any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state." *Id*. § 27.001(4)(B), (E). Finally, "exercise of the right of association" is "a communication between individuals who join together to collectively express, promote,

5

pursue, or defend common interests." *Id*. § 27.001(2). The term "communication"—a component of all three forms of protected conduct under the TCPA—is defined as "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id*. § 27.001(1).

Under the second step, if the trial court determines that the movant has met his burden to show that the TCPA applies, the burden shifts to the nonmovant to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Even if the nonmovant presents a sufficient prima facie case, the trial court must dismiss the legal action "if the [movant] establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id*. § 27.005(d).

In determining whether to grant a TCPA motion to dismiss, the trial court "shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a) ("Evidence"). The court may allow specified and limited discovery relevant to the motion on a showing of good cause, *id.* § 27.006(b), but otherwise, all discovery in the legal action is suspended until the court has ruled on the motion to dismiss, *id.* § 27.003(c). In reviewing trial court's ruling on a motion to dismiss under the TCPA, we apply a de novo standard of review. *Serafine*, 466 S.W.3d at 357. That is, we review de novo whether each party has met its respective burden under the Act's two-step dismissal mechanism. *Long Canyon Phase II & III Homeowners Ass'n v. Cashion*, 517 S.W.3d 212, 217 (Tex. App.—Austin 2017, no pet.).

To the extent resolution of this appeal turns on construction of the TCPA, we also review these issues de novo. *Lippincott*, 462 S.W.3d at 509 (citing *Molinet v. Kimbrell*, 356 S.W.3d

6

407, 411 (Tex. 2011)). When construing the TCPA, as with any other statute, our objective is to give effect to the legislative intent, looking first to the statute's plain language. *Id.* (citing *Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008)). If that language is unambiguous, "we interpret the statute according to its plain meaning." *Id.* "We presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted." *Id.* (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)). "We are also mindful that the Legislature has directed us to construe [the TCPA] 'liberally to effectuate its purpose and intent fully.'" *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 27.011(b)).

## DISCUSSION

In its April 2017 order, the trial court expressly denied the GTS Defendants' motion to dismiss for two independent reasons: (1) the GTS Defendants failed to carry their burden to establish that the TCPA applies to the Plaintiffs' claims, and (2) even if the TCPA does apply, the Plaintiffs met their burden to demonstrate a prima facie case for each essential element of their claims. *See* Tex. Civ. Prac. & Rem. Code § 27.005. On appeal, the GTS Defendants challenge each of these conclusions, and we will consider each of these challenges in turn.[3]

---

[3] Specifically, the trial court's order states:

(1)    The Court finds under [TCPA, section 27.005(b),] that the Defendants have failed to show by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of the right of free speech, the right to petition, or the right of association; and

(2)    Alternatively, the Court finds:

    a.    under [TCPA, section 27.005(c)] that the Plaintiffs have established

7

**1. Does the TCPA apply to the Plaintiffs' suit?**

Applying the de novo standard of review, we first examine whether the GTS Defendants satisfied their initial burden of proving that the TCPA applies to the lawsuit filed by the Pivot Plaintiffs. To satisfy this burden, the GTS Defendants were required to demonstrate by a preponderance of the evidence that (1) the Pivot Plaintiffs' "legal action" (2) "is based on, relates to, or is in response to" (3) the GTS Defendants' exercise of their right of free speech, petition, or association. *See id.* § 27.005(b).

In support of their motion to dismiss, the GTS Defendants attached the affidavits of several GTS officers and employees, including Laura Grant (current owner and CEO of GTS), Ryan Grant (current president of GTS and spouse of Laura Grant), and Anne Fielding (director of finance and operations at Acquisition from 2011 to 2016), along with supporting documentation. According to Laura Grant, she acquired the option to purchase GTS in 2014 when then-majority owner, Jana Grimes, decided to sell her majority-ownership interest in GTS.[4] The purchase would

---

> by clear and specific evidence a prima facie case for each essential element of the claim in question; and

> b.     under [TCPA, section 27.005(d)] that Defendants have failed to establish by a preponderance of the evidence each essential element of a valid defense to the Plaintiffs' claims.

In this appeal, the GTS Defendants do not challenge the trial court's finding that they "failed to establish by a preponderance of the evidence each essential element of a valid defense." *See* Tex. Civ. Prac. & Rem. Code § 27.005(d).

[4] In connection with the 2011 Asset Purchase Agreement, GTS's owners entered into an option agreement with Pivot, with each owner giving Pivot an assignable right to purchase their interest in GTS, if and when he or she should decide to sell. When Grimes decided to sell her interest in GTS, Pivot assigned its right to purchase Grimes's interest to Laura Grant.

make Laura Grant the owner and CEO of GTS, and the change in ownership would require GTS to petition the State of Texas for recertification as a HUB. Consequently, before exercising her option to purchase GTS, Laura Grant wanted "to ensure that GTS's HUB status would be preserved" and, consequently, she sought to obtain legal advice on the HUB recertification process.

At Laura Grant's urging, GTS hired a law firm to review GTS's business practices as they related to HUB recertification, including any effect of GTS's then-existing relationship with Acquisition and Pivot. On October 31, 2014, the law firm prepared a memo (the "Ozburn Memo") identifying a number of areas of concern related to GTS's HUB status and specifically warning that "the relationships between [GTS] and [Acquisition]," including the option agreement, "create significant risks for [GTS]'s HUB status."

Laura Grant, Ryan Grant, and Ann Fielding later prepared an internal memo (the "Grant-Fielding Memo") based on areas of concern identified in the Ozburn Memo. At the time of the drafting of the Grant-Fielding Memo, Ryan Grant was president of Acquisition and Fielding was director of finance and operations at Acquisition. The memo, dated October 31, 2014, provided additional analysis of the identified concerns and made specific recommendations aimed at separating GTS's on-going HUB business from the business of Acquisition and Pivot. Among other things, the Grant-Fielding Memo suggested that GTS maintain separate books from Acquisition and Pivot and that the parties negotiate fixed rates for Acquisition and Pivot's contracted services to GTS.[5] In addition, the Grant-Fielding Memo recommended that Acquisition transfer back to GTS's

_____

[5] According to the GTS Defendants, as part of the new structure created by the Asset Purchase Agreement, the parties entered into an Administrative Services Agreement, a Distribution Agreement, and Licensing Agreement "calling for Acquisition to perform much of the back-end

9

payroll certain employees who had been transferred to Acquisition following execution of the Asset Purchase Agreement.

In the months that followed, the parties began executing the recommendations laid out in the Ozburn Memo and the Grant-Fielding Memo. In November and December 2014, Fielding and another Pivot employee executed the transfer of the Acquisition employees to GTS, as recommended in the Grant-Fielding Memo and, according to Fielding, as approved by GTS. In January 2015, in exchange for Acquisition's retention of Fielding as an employee, Pivot and Acquisition agreed to transfer Ryan Grant to GTS. In October 2015, GTS and Acquisition renegotiated the terms of the service agreements that were executed by the parties in conjunction with the Asset Purchase Agreement. As recommended by the memos, the renegotiated agreement specified the actual fees that Acquisition would charge GTS for certain services provided under the service agreements and provided that either party could terminate the agreements without cause on ninety days' notice.

In addition, Fielding devised a method for separating the accounting records of the two companies, as proposed in the Grant-Fielding memo. According to Fielding, because GTS held itself out as a HUB to all Texas customers but not to non-Texas customers, she proposed dividing the accounting records such that "Texas-based [HUB] customers belonged to GTS and non-Texas [non-HUB] customers belonged to Acquisition." Ultimately, Laura Grant purchased Grimes's ownership interest in GTS, and on March 31, 2015, GTS was recertified as a HUB by the Texas Comptroller's Office.

---

support work (e.g., billing, accounting, payroll, etc.)."

10

In his affidavit, Ryan Grant, currently president of GTS, states that "[i]n late 2014, [he] learned that [Pivot] was misrepresenting the relationship between the parties in [Pivot's] public financial filing," specifically that Pivot "improperly recognized GTS's revenue as its own, erroneously claiming that GTS was Pivot's agent, thereby implying a level of control over GTS that would have been inconsistent with the requirements in the HUB regulations." According to Ryan Grant, he and GTS, Laura Grant, and Anne Fielding "repeatedly notified Pivot that its characterization in public filings was incorrect and should be corrected," but Pivot refused. Further, according to Ryan Grant, Pivot incorrectly charged GTS for performance-based commissions that Acquisition had paid to its employees in 2015. Although GTS informed Pivot of the improper charges, Pivot refused to reverse the charges.

In 2016, Laura Grant and Ryan Grant made the decision that GTS should end its relationship with Pivot and Acquisition. According to Ryan Grant, the parties were unable to agree on the terms of separation, and on June 1, 2016, GTS notified Acquisition and Pivot that it was terminating the service agreements.

In their original petition, the Pivot Plaintiffs lay out a very different version of the events leading to the lawsuit. The Pivot Plaintiffs allege that at the time the Asset Purchase Agreement was executed, the owners of GTS stock, including Ryan Grant, as trustee of the Ryan R. Grant 2007 Trust, signed a Non-Competition and Non-Disclosure Agreement. This agreement provided that neither GTS nor its shareholders could compete with Acquisition for business that did not require HUB status for a period of five years and that they could not use any confidential information for their own use. In addition, when Acquisition hired Ryan Grant as its president, he became bound to certain restrictive covenants, including covenants of non-disclosure, non-solicitation, and

11

non-competition. "[F]ollowing the Asset sale, [Acquisition] hired the majority of GTS's former employees," and "Pivot largely relied on Mr. Grant in hiring his team at [Acquisition]." The Pivot Plaintiffs assert that these transferred employees also became bound to non-disclosure, non-competition, and non-solicitation obligations.

Later, when shareholder Jana Grimes indicated that she wanted to sell her ownership interest in GTS, Ryan Grant, then president of Acquisition, "put into motion his plan to misappropriate and convert non-HUB assets that GTS had sold to ARC" by recommending that Pivot assign its option to purchase Grimes's interest to his wife, Laura Grant. According to the Pivot Plaintiffs, Pivot agreed to Ryan Grant's recommendation only after Ryan Grant represented that Laura Grant would sign a new option agreement with Acquisition. PTS, a company related to Pivot, then engaged Laura Grant for a year as a consultant pursuant to a Consulting Agreement for the purpose of preparing and training her for her new role at GTS. According to the Pivot Plaintiffs, Ryan Grant's recommendation that his wife become an owner in GTS was part of the Grants' scheme to take over GTS and "convert assets previously sold to [Acquisition]." In their live pleadings, the Pivot Plaintiffs allege the following:

93. Under the guise of preparing for recertification, [Ryan Grant] requested that [Acquisition] further separate the entities, including that they set up new payroll for GTS, obtain new and separate benefit plans for GTS employees, transfer [Aquisition's] employees to the GTS payroll, and permit [Laura Grant] to delay executing the option agreement until after GTS has been recertified as a HUB with [Laura Grant] as the owner and [CEO].

94. Pivot and [Acquisition] agreed to some of [Ryan Grant's] requests, including his requests to maintain separate payroll and benefits and transfer some of the [Acquisition] employees to GTS.

12

. . . .

96. Pivot and [Acquisition] further agreed to transfer some of [Acquisition's] employees to the GTS payroll, subject to Pivot's approval of which employees would be transferred.

97. [Ryan Grant] submitted a list of employees to Pivot that he suggested be transferred from [Acquisition] to GTS. The list of proposed transfers included nearly all of [Acquisition's] management and profit-generating employees.

98. [Acquisition and Pivot] rejected [Ryan Grant's] proposed list.

. . . .

100. Without any approval from any other [Aquisition] or Pivot representative, Fielding effectuated the transfers as directed by [Ryan Grant].

. . . .

105. After surreptitiously moving the Transferred Employees and setting upon GTS's administrative processes, [Ryan Grant] separated himself from [Acquisition] by representing to Pivot that he needed to be employed by GTS due to the work he performed. Pivot agreed that [Ryan Grant] could transfer to GTS effective January 1, 2015.

The Pivot Plaintiffs go on to allege that "Mr. Grant and the Transferred Employees misappropriated Acquisition's existing business with its non-HUB customers, solicited both new non-HUB work from these existing customers and solicited new non-HUB customers in the marketplace, now under the GTS name." "Under the guise of further separating the entities for HUB purposes, GTS set up an independent payroll, a medical benefit plan, and a 401(k) plan in or around December 2015." GTS then changed its name to "ARC Government Solutions, Inc.," began using a logo that is nearly identical to Acquisition's logo, and released a series of misleading press releases. In short, according to the Pivot Plaintiffs' allegations, the Defendants used the HUB

13

recertification process, and thus the recommendations laid out in the Ozmun Memo and the Grant-Fielding Memo, as a means of converting Acquisition's non-HUB assets and business.

With these competing versions of the factual background in mind, we now turn to whether these facts, as supported by the relevant record, bring the Pivot Plaintiffs' claims within the purview of the TCPA. *See* Tex. Civ. Prac. & Rem. Code § 27.006(a).

### A. *"Exercise of the right of free speech"*

The GTS Defendants assert that the trial court erred in concluding that the TCPA does not apply to the Pivot Plaintiffs' "legal action" because the record on their motion to dismiss establishes that all of the Pivot Plaintiffs' claims are "based on, relate[d] to, or [are] in response to" two categories of communications: (1) communications made in connection with GTS's HUB status, petition for recertification of GTS's HUB status, and need and ability to operate as a legitimate HUB, and (2) communication between GTS Defendants who had joined together to pursue a common interest in employment with GTS and in ensuring GTS was able to operate as a HUB. In determining whether the GTS Defendants met their burden to show that the TCPA applies to the Pivot Plaintiffs' claims, we begin our analysis by considering whether these two categories of communications identified by the GTS Defendants qualify as protected communications under the TCPA. That is, assuming that at least some of the GTS Defendants' alleged conduct falls within the TCPA definition of "communication," we examine whether these categories of communications constitute the exercise of (1) the right of free speech; (2) the right of petition; or (3) the right of association. *See id.* § 27.001(2)-(4).

14

With respect to first category—communications made in connection with "GTS's HUB status, GTS's petition for recertification of its HUB status, and GTS's need and ability to operate as a legitimate HUB"—the GTS Defendants argue that these communications are protected under the TCPA because they constitute an "exercise of the right of free speech." As previously noted, the TCPA broadly defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern." *See id.* § 27.001(3). A "'matter of public concern' includes" but is not limited to "an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id.* § 27.001(7). According to the GTS Defendants, GTS's HUB status is a matter of "public concern," and as a result, any communication made "in connection with" GTS's HUB status constitutes the "exercise of the right of free speech" under the TCPA. In response, the Pivot Plaintiffs assert that such communications are not an "exercise of the right of free speech" because GTS's HUB status is not a "matter of public concern" but instead "is a matter of one company's business opportunities."

In construing the "exercise of the right of free speech" under the TCPA, the Texas Supreme Court has squarely rejected the notion that the TCPA is limited to speech exercised in a public forum about purely public matters. In *Lippincott v. Whisenhunt*, the Texas Supreme Court considered whether the TCPA applied to allegedly defamatory statements made in private e-mails about an employee nurse anesthetist. 462 S.W.3d at 509-10. In concluding that the TCPA applied to the privately made statements, the court explained that while the plain language of the TCPA "limits its scope to communications involving a public matter," nothing in the Act requires that

15

the form of the communications be public. *Id*. at 509. Although the statements at issue in *Lippincott* concerned a private employment matter, the statements related to whether the nurse "properly provided medical services to patients" and therefore were made "in connection with" a matter of public concern. *Id.* at 509-10. In other words, although the private communications only directly concerned a private matter (the manner in which a single employee carried out his job duties), the communications were made in the context of the provision of healthcare, a "matter of public concern." *Id.* at 510. As the court later explained in *ExxonMobil Pipeline Company v. Coleman*:

> The TCPA does not require that the statements specifically "mention" [the statutorily identified matter of public concern], nor does it require more than a "tangential relationship" to the same; rather, TCPA applicability requires only that the defendant's statements are "in connection with" "issue[s] related to" health, safety, environmental, economic, and other identified matters of public concern chosen by the Legislature.

512 S.W.3d at 900 (concluding that internal communications regarding pipeline employee's failure to follow required fuel-tanks "gauging" procedure constituted "exercise of the right of free speech" where uncontroverted evidence was that purpose of procedure was, in part, "to reduce the potential environmental, health, safety and economic risks associated with [fuel spills]").

Here, the State's policy of "encourag[ing] the use of historically underutilized businesses," 34 Tex. Admin. Code § 20.281 (Tex. Comptroller of Pub. Accounts, Policy and Purpose), in government purchasing and contracting, Tex. Gov't Code §§ 2161.181-.183 (requiring state agencies to use "good faith effort" to increase contract awards to HUBs), the Comptroller's administration of the HUB program, and the HUB recertification process are all issues that are related to "government" and to "economic well-being." *See* Tex. Civ. Prac. & Rem. Code § 27.001(7).

16

As a result, the HUB program is a "matter of public concern," and any communications, public or private, made by the GTS Defendants "in connection with" the HUB program constitute an "exercise of the right of free speech" as defined in the TCPA. *See id.* We therefore conclude that communications made in the context of GTS's involvement with the HUB program—including statements or documents concerning GTS's HUB status, petition for recertification of GTS's HUB status, and the need and ability for GTS to continue to operate as a HUB—qualify as an "exercise of the right of free speech" under the TCPA.[6] *See Lippincott*, 462 S.W.3d at 510.

## B.      *"Exercise of the right of association"*

Next, we consider whether "communications between GTS Defendants who had joined together to pursue a common interest in employment with GTS and in ensuring GTS was able to operate as a HUB" are protected communications under the TCPA. The GTS Defendants assert that communications in this category qualify as an "exercise of the right of association" under the TCPA because the communications are "between individuals who join together to collectively express, promote, pursue, or defend common interest." *See* Tex. Civ Prac. & Rem. Code § 27.001(2).

In *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, this Court considered whether the TCPA applied to claims that former body shop employees had improperly shared "confidential,

---

[6] The GTS Defendants also argue that communications about GTS's HUB status qualify as an "exercise of the right to petition." *See* Tex. Civ. Prac. & Rem. Code § 27.001(4)(B) (defining "exercise of the right to petition," in part, as "communications in connection with an issue under consideration or review by legislative, executive judicial, other governmental body or in another governmental or official proceeding," as well as "any other communication that falls within the protection of the right to petition government under the Constitution of the United States of the constitution of this state"). Because we conclude that the communications are protected under the TCPA as an "exercise of the right of free speech," we need not decide this issue. *See* Tex. R. App. P. 47.1.

17

proprietary, and trade secret information" with their new employer, a competing body shop, and that the information was used by the new employer to "obtain an unfair advantage in the marketplace" and "to convince more employees to leave" and join the competitor's business. 520 S.W.3d at 194. Relying on the plain language of the TCPA's definitions of protected communications, we rejected the argument made by Autocraft (the former employer and plaintiff) that the TCPA was limited to publicly made "communications" protected by the First Amendment. *Id*. at 199, 204. This Court concluded that Autocraft's complaints regarding "'communications' among appellants within the [Elite Auto] enterprise through which they have allegedly shared or used the [Autocraft] information in question," as well as communications by Elite Auto "to current Autocraft employees aimed at luring them to [Elite Auto]" fell within the scope of the TCPA because the communications were made "in furtherance of the [Elite Auto] business enterprise relative to [Autocraft's] competitive position" and were an "exercise of the right of association." *Id*. at 205. Based on our holding in *Elite Auto*, we agree with the GTS Defendants that any communications "between GTS Defendants who had joined together to pursue a common interest in employment with GTS and ensuring GTS was able to operate as a HUB" constitute an "exercise of the right of association."

## C. "[L]egal action . . . based on, relates to, or in response to"

Having concluded that the categories of communications identified by the GTS Defendants generally qualify as protected communications under the TCPA, we next decide whether the GTS Defendants met their burden to show that the Pivot Plaintiffs' "legal action is based on, relates to, or is in response to" these communications. *See* Tex. Civ. Prac. & Rem Code § 27.005(b). The Act defines "legal action" as a "lawsuit, cause of action, petition, complaint, cross-claim, or

18

counterclaim or any other judicial pleading or filing that requests legal or equitable relief." *Id.* § 27.001(6). As we will discuss later, the Pivot Plaintiffs contend that some of their claims are exempt under section 27.010 of the TCPA and that some of their claims are excluded from the TCPA pursuant to the Texas Covenant Not To Compete Act. The Pivot Plaintiffs do not dispute, however, that each of their claims generally qualifies as a "legal action," as that phrase is defined in the TCPA.

The phrase "based on, relates to, or is in response to" dictates the nexus that must exist between the "legal action" and the protected conduct under the TCPA. Although not further defined in the Act, the phrase serves to capture, at a minimum, a "legal action" that is factually predicated on the alleged conduct that falls within the scope of TCPA's definition of "exercise of the right of free speech," petition, or association. *Cavin*, 545 S.W.3d at 59. Moreover, as this Court recently noted in *Cavin v. Abbott*, the Texas Supreme Court has rejected the assertion that the plain language of the phrase, which includes no qualification as to its limits, requires "something more than a tenuous or remote relationship." *Id.* at 63 (citing *ExxonMobil*, 512 S.W.3d at 901). Instead, based on the ordinary meaning of the terms, a plaintiff's claims are "related" to a protected communication when there is "some sort of connection, reference, or relationship between them," and are "in response to" a protected communication when they "react[] to or [are] asserted subsequently" to the communication. *Id.* at 69.

From the face of the Pivot Plaintiffs' live petition, we conclude that the Pivot Plaintiffs' claims of fraud and unjust enrichment, in part, are "based on, relate[d] to or [are] in response to" the GTS Defendants' "exercise of the right of free speech" (communications in connection with

the HUB program).[7] Each of these claims is factually predicated on a promise by one or more of the GTS Defendants to execute a new option agreement after successfully recertifying as a HUB. As alleged, the promise was made "in connection with" the HUB recertification process and therefore constitutes an "exercise of the right of free speech."

Second, we conclude that the Pivot Plaintiffs' remaining claims are "based on, relate[d] to or [are] in response to" the GTS Defendants' "exercise of the right of association" or are "related to" the GTS Defendants' "exercise of the right of free speech." For example, the Pivot Plaintiffs' live pleadings include allegations that

> (1) GTS, Ryan Grant, and shareholders breached their non-compete agreement, in part, by
>
>> (a) "[m]isappropriating [Acquisition's] confidential information,"
>>
>> (b) competing directly with [Acquisition] in the "highly competitive [computer market],"
>>
>> (c) "[u]sing [Acquisition's] confidential information to unfairly compete with [Acquisition],"
>>
>> (d) "[s]oliciting and employing [Acquisition] employees who were employed by GTS prior to the Asset sale," and by
>>
>> (e) "[i]nterfering with and/or disrupting the relationship between [Acquisition] and its employees and independent contractors";

---

[7] In their original petition, the Pivot Plaintiffs allege in their fraud claim that Ryan and Laura Grant "fraudulently promised and agreed to execute a new option agreement in favor of [Acquisition] after GTS successfully recertified as a HUB." Similarly, in support of their unjust enrichment claim, the GTS Defendants allege, in part, that Ryan and Laura Grant "promised and agreed that [Laura Grant] would execute a new option agreement in favor of Pivot or [Acquisition] after GTS successfully recertified as a HUB"; "[b]ased on this promise, Pivot designated [Laura Grant] as Ms. Grime's successor"; and "following the successful recertification, [Laura Grant] refused to execute the option agreement."

20

(2) other GTS Defendants breached their employment agreements by

    (a) "[m]isappropriating [Acquisition's] proprietary information,"

    (b) "soliciting, accepting business from and doing business with [Acquisition] customers,"

    (c) using Acquisition's proprietary information to unfairly compete,

    (d) "[s]oliciting ARC employees to terminate their employment with [Acquisition] to become employed by GTS,"

    (e) "transferring, without authorization, [Acquisition's] revenue generating and executive employees to GTS,"

    (f) "[h]iring and/or participating in the hiring of employees previously employed by [Acquisition]," and

    (g) "[i]nterfering with and/or disrupting the relationship between ARC and its employees and independent contractors, including [Laura Grant]";

(3) several GTS Defendants (former employees) that left Acquisition and went to work for GTS breached agreements of non-disclosure, non-competition, and non-solicitation of customers and these employees breached a fiduciary duty owed to Acquisition by engaging in this same conduct;

(4) Laura Grant breached her consulting agreement by, in part, "misappropriating confidential information for her personal benefit and the benefit of GTS," "using [this confidential information] to unfairly compete with [Acquisition]," "disclosing [this confidential information] to third parties," and "soliciting, accepting business from and doing business with [Acquisition] customers"; and

(5) GTS "tortiously interfer[ed] with [Acquisition's and Pivot's] contractual relationships with" Ryan Grant and Laura Grant.

Further, the Pivot Plaintiffs allege that the GTS Defendants conspired to commit all these "illegal acts" in order to "unfairly compete with [Acquisition], steal [Acquisition's] non-HUB business, customers, and other assets, tortiously interfere with [Acquisition's] contractual relationships,

21

misappropriate [Acquisition's] confidential information and trade secrets, and usurp [Acquisition's] business opportunities," and that the GTS Defendants did so with a "common plan."

Based on these allegations, we conclude that many of the Pivot Plaintiffs' claims are factually predicated on GTS's solicitation and hiring of Acquisition employees and/or on an alleged sharing and using of Acquisition's confidential information. Consequently, these claims (which are almost identical to those brought by the plaintiffs in *Elite Auto*) are "based on, relate[d] to, or [are] in response to" communications "between GTS Defendants who had joined together to pursue a common interest in employment with GTS and ensuring GTS was able to operate as a HUB," protected as an "exercise of the right of association." *See Elite Auto*, 520 S.W.3d at 205 (concluding that complaints regarding communications of sharing and or using plaintiff's information in enterprise and communications "aimed at luring" competitor's employees were protected as "exercise of the right of association").

In addition, the Pivot Plaintiffs' remaining claims concern complaints that the GTS Defendants improperly transferred Acquisition employees and other assets and that the GTS Defendants "solicited," "accept[ed] business from," and "converted" the Pivot Plaintiffs' customers. The record demonstrates that these claims stem from the recommendations for separating GTS and Acquisition set forth in the Ozburn Memo and the Grant-Fielding Memo, communications made in the context of the HUB certification process and preservation of GTS's HUB status. As a result, we conclude that these claims are "relate[d] to" and are "in response to" the GTS Defendants' "exercise of the right of free speech."

Based on the pleadings and the evidence presented by the parties, we conclude that the GTS Defendants met their burden to show that each of the Pivot Plaintiffs' claims, or "legal

actions," is "based on, relate[d] to, or in response to" protected communications under the TCPA. Consequently, the trial court erred in denying the GTS Defendants' motion to dismiss on this ground.

**2.      Did the Pivot Plaintiffs establish a prima facie case for their claims?**

In their second issue, the GTS Defendants assert that the trial court erred in denying their motion to dismiss on the alternative ground that the Pivot Plaintiffs satisfied their burden under the TCPA to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." *See* Tex. Civ. Prac. & Rem. Code § 27.005(c). A prima facie case "refers to evidence sufficient as a matter of law to establish a given fact if not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015). "It is the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id*. (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)); *Long Canyon*, 517 S.W.3d at 222 (recognizing same). In addition, the TCPA limits the type of evidence from which a prima facie case may be made to that evidence which is "clear and specific"—"clear" meaning "unambiguous," "sure or free from doubt," and "specific" meaning "'explicit' or 'referring to a particular named thing.'" *In re Lipsky*, 460 S.W.3d at 590; *see also* Black's Law Dictionary 307 & 1616 (10th ed. 2014). Thus, the term "'clear and specific evidence' refers to the quality of evidence required to establish a prima facie case, while the term 'prima facie case' refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden." *Serafine*, 466 S.W.3d at 358. "Collectively, these elements require that a party 'provide enough detail to show the factual basis for its claim,' and thus effectively abrogate the utility of mere notice pleading as 'evidence' to that end." *Cavin*, 545 S.W.3d at 72 (quoting *In re Lipsky*, 460 S.W.3d at 590-91). Conclusory statements and bare baseless opinions

23

are not probative and accordingly do not establish a prima facie case. *Long Canyon,* 517 S.W.3d at 222 (citing *In re Lipsky*, 460 S.W.3d at 592-93).

In response to the motion to dismiss, the Pivot Plaintiffs chose not to support their claims or supplement their pleadings with affidavits and instead relied solely on the allegations in their petition and the documents attached to their petition. *See* Tex. Civ. Prac. & Rem. Code § 27.006. On appeal, the GTS Defendants assert that although these pleadings and supporting documents are lengthy, they are ultimately "characterized by an utter lack of evidence and an insurmountable lack of specificity." According to the GTS Defendants, the "Plaintiffs have failed to plead basic who-what-where-when facts, and have not supported their pleadings with evidence." In part, the GTS Defendants assert that a showing of actual damages or injury is required as an essential element of each of the Pivot Plaintiffs' claims for compensatory damages against the GTS Defendants and that with regard to every claim, the Pivot Plaintiffs have failed to make a "clear and specific prima facie case" that they have, in fact, suffered actual damages or injury.

With respect to actual damages or injury stemming from their claims for breach of contract, tortious interference with contract, and breach of fiduciary duty, the Pivot Plaintiffs allege in their response to the motion to dismiss and in their live pleadings that they have suffered, and will continue to suffer damages, such as lost profits, lost revenue, lost opportunities, loss of goodwill, loss of customers, and a diminution in the value of their assets. The Pivot Plaintiffs also allege that the GTS Defendants' "tortious conduct has caused—and will continue to cause damages" to the Pivot Plaintiffs "in an amount exceeding $1,000,000, to be proven at trial." Similarly, in support of their claims for conversion, theft, trade secret misappropriation, unfair competition, harmful access

24

by computer, and conspiracy, the Pivot Plaintiffs generally allege that they "have suffered and will continue to suffer damages, including deprivation as to the use and value of such property, lost profits, lost revenue, lost opportunities, loss of goodwill and compensatory damages" and that the acts of the GTS Defendants "have caused and will continue to cause damages to [Acquisition] in an amount exceeding $1,000,000, to be proven at trial."

Assuming without deciding that the Pivot Plaintiffs' live pleadings otherwise provide adequate specificity with regard to the wrongful actions taken by the GTS Defendants, we conclude the pleadings fail to describe with the requisite detail how the alleged actions resulted in any actual damages or injuries. *See In re Lipsky*, 460 S.W.3d at 593 (explaining that "general averments of direct losses and lost profits," even in specified dollar amounts, do not satisfy minimum requirements of TCPA). For example, the Pivot Plaintiffs' pleadings fail to identify any particular lost customer, lost sale, or lost business opportunity caused by the GTS Defendants' conduct. In addition, although the Pivot Plaintiffs generally describe property and confidential information allegedly taken or improperly disclosed by the GTS Defendants, the Pivot Plaintiffs do not describe any factual basis for determining the value of the allegedly taken property or for calculating the loss of its use. In short, based on the relevant record before us, we conclude that the Pivot Plaintiffs pleadings fail to provide the element-by-element, claim-by-claim factual specificity required by the Act with regard to damages. *See Peterson v. Overlook at Lake Austin, L.P.*, No. 03-16-00557-CV, 2018 WL 1321532, at *3-4 (Tex. App.—Austin Mar. 15, 2018, no pet.) (mem. op.) (concluding that trial court erred in denying motion to dismiss on claims for breach of contract and tortious interference with contract because plaintiff did not establish prima facie case for damages element of claims); *see also In re*

25

*Lipsky*, 460 S.W.3d at 592 (explaining that "[b]are, baseless opinions do not create fact questions, and neither are they a sufficient substitute for clear and specific evidence required to establish a prima facie case under the TCPA").

In response, the Pivot Plaintiffs claim that they should not be required to plead additional specific facts regarding damages at this early stage of the proceedings and that it is impossible for them to know the exact scope of their damages because "Defendants intentionally hid data and made damages difficult to prove in this case." The Pivot Plaintiffs assert that "extensive factual and expert discovery, examination of Defendants' witnesses, and analysis by experts in fields such as accounting forensics and computer forensics, will be necessary to determine damages."

We understand that additional evidence may be necessary for the Pivot Plaintiffs to ultimately convince the trier of fact of its claims and of its exact damages and that such evidence may only be obtained through the course of lengthy investigation and discovery. Nevertheless, the plain language of the TCPA requires at this stage "clear and specific evidence" of a "prima facie case" as to every essential element of each and every claim, including damages. *See* Tex. Civ. Prac. & Rem. Code § 27.005(c). Although the Pivot Plaintiffs were not required at this stage of the litigation to prove the exact amount of their damages, they were required to provide "clear and specific" evidence of some damages suffered. *See Long Canyon*, 517 S.W.3d at 224 (noting that trial court erred in denying motion to dismiss because plaintiffs did not specify damages caused by alleged negligence, "much less supply clear and specific evidence of those damages"). To the extent the Pivot Plaintiffs needed additional discovery to meet this burden, the Act provides that the trial court may allow "specified and limited discovery relevant to the motion" upon a showing of good cause.

26

Tex. Civ. Prac. & Rem. Code § 27.006(b). The Pivot Plaintiffs never filed a motion or otherwise asserted that good cause existed to permit limited discovery in this case.

The Pivot Plaintiffs also argue that their claims cannot be dismissed based on a lack of specific allegations supporting damages because, in addition to actual damages, they are seeking equitable relief in the form of an accounting, constructive trust, and a permanent injunction. *See T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ("A suit for an accounting is generally founded in equity."). Generally, a party seeking equitable relief must demonstrate, among other things, that he has no adequate remedy at law—such as when, with respect to a request for an injunction, monetary damages would be inadequate to compensate the aggrieved party, *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577 (Tex. App.—Austin 2000, no pet.), or with respect to a request for an accounting, the party cannot obtain the information through the use of standard discovery procedures, *T.F.W. Mgmt.*, 79 S.W.3d at 717.

In support of their request for an accounting, the Pivot Plaintiffs claim that "GTS converted [Acquisition's] customers, unlawfully received and retained monies paid by [Acquisition's] customers, and diverted [Acquisition's] business to a third party so that it receives revenue from the staff augmentation business." Similarly, the Pivot Plaintiffs claim that the imposition of constructive trust is necessary to preserve wrongfully diverted funds. With respect to their request for injunctive relief, the Pivot Plaintiffs assert that an injunction against the GTS Defendants is necessary "to prevent them from continuing to violate the terms of their non-competition covenants and all other restrictive covenant agreements with [Acquisition]." Further, the Pivot Plaintiffs allege that '[t]he resulting harm will be irreparable due to the nature of the wrong, and no adequate remedy at law exists."

27

Based on the evidence and pleadings, we conclude that the Pivot Plaintiffs have failed to meet their burden to provide clear and specific evidence sufficient to support their claims for equitable relief. Like their claims for compensatory damages, the Pivot Plaintiffs fail to identify any actual loss or injury, such as a specific lost customer or business opportunity, an essential element of many of their underlying causes of action. *See In re Lipsky*, 460 S.W.3d at 593. Moreover, the Pivot Plaintiffs fail to allege specific facts demonstrating that compensatory damages would be inadequate or that the requested accounting information could not be obtained through ordinary discovery procedures. *See Long Canyon,* 517 S.W.3d at 224 (concluding that plaintiffs failed to establish prima facie case for injunctive relief seeking to prevent homeowners association from harassing and causing emotional distress because plaintiffs did not provide evidence of irreparable injury or inadequate remedy at law).

Because the Pivot Plaintiffs failed to present clear and specific evidence of a prima facie case for every essential element of each and every claim for relief, the trial court erred in denying the GTS Defendants' motion to dismiss on this ground.

## 3. Are there alternative grounds to support the trial court's denial of the motion to dismiss?

In their responsive briefing on appeal, the Pivot Plaintiffs argue that the trial court could have properly denied the GTS Defendants' motion to dismiss, in whole or in part, for three additional, independent reasons: (1) the motion to dismiss was untimely filed under the deadline imposed by the TCPA as to GTS, Ryan Grant, and Laura Grant; (2) some or all of the Pivot Plaintiffs' claims are exempt from the TCPA under the statutory exemption for commercial speech; and (3) the Texas Covenants Not to Compete Act (CNCA) precludes application of the TCPA with respect to

their claims for enforcement of covenants not to compete. Although the trial court did not expressly rule on these alternative grounds when it denied the motion, because "no additional trial-level proceedings are necessary for the issues to be judicially determined," we will examine whether these grounds support the trial court's decision to deny the GTS's motion to dismiss. *See Cavin*, 545 S.W.3d at 71 (concluding that appellate court could decide additional issue of whether movants established each essential element of valid defense under section 27.005(d), even though trial court did not reach this issue).

### A. TCPA filing deadline

We turn first to the Pivot Plaintiffs' contention that certain GTS Defendants (GTS, Laura Grant, and Ryan Grant) failed to timely file their motion to dismiss under the deadline imposed by the TCPA, and thus the motion was not properly before the trial court. Section 27.003(b) provides that a motion to dismiss must be filed "not later than the 60th day after the date of service of the legal action." Tex. Civ. Prac. & Rem. Code § 27.003(b). The court may, however, "extend the time to file a [motion to dismiss] on a showing of good cause." *Id.*

With regard to "the date of service of the legal action," Rule 119 of the Texas Rules of Civil Procedure states:

> The defendant may accept service of process, or waive the issuance of service thereof by a written memorandum signed by him, or by his duly authorized agent or attorney, after suit is brought, sworn to before a proper officer other than an attorney in the case, and filed among the papers of the cause, and *such waiver or acceptance shall have the same force and effect as if the citation had been issued and served as provided by law.* . . .

Tex. R. Civ. P. 119 (emphasis added). Under the plain language of this rule and of section 27.003(b), when service of process is accepted or waived and a memorandum of service in compliance with Rule 119 is filed with the trial court clerk, the deadline for filing a TCPA motion to dismiss is calculated from the date of the waiver or acceptance of service as evidenced by the memorandum.

In this case, however, nothing in the record suggests, and the Pivot Plaintiffs do not contend, that they obtained or even attempted to obtain a formal written memorandum for service of process in compliance with Rule 119. Instead, in support of their argument, the Pivot Plaintiffs attached the affidavit of Erin McLaughlin, an attorney for Pivot and Acquisition, to their response to the GTS Defendants' motion to dismiss. In her affidavit, McLaughlin avers that an attorney for GTS "advised [her] by telephone on December 2, 2016, that he was accepting service on behalf of GTS, Mr. Grant, and Mrs. Grant." The Pivot Plaintiffs argue that section 27.003's sixty-day deadline is mandatory, and that because these three defendants waited to file their motion to dismiss until seventy-four days from the date their attorney accepted service, the TCPA motion to dismiss is time barred with respect to these defendants.

In response to the Pivot Plaintiffs' argument that their TCPA motion to dismiss was untimely, the GTS Defendants submitted to the trial court the declaration of David Weaver, an attorney representing many of the GTS Defendants, including GTS, Laura Grant, and Ryan Grant. According to Weaver:

> Between November 23, 2016, and December 16, 2016, I engaged in a series of e-mail exchanges and telephone calls with Attorney McLaughlin. In each of these conversations, Attorney McLaughlin and I discussed which of the approximately 30 defendants I represented and whether I had accepted service on behalf of any defendants. My understanding was that Attorney McLaughlin was planning to initiate the formal and costly procedures to effect personal service on any defendant who I did not represent.

Weaver goes on to state:

> Prior to December 16, 2016, to the best of my recollection, I did not agree—orally or in writing—to formally accept service on behalf of any defendants. Rather, before December 16, 2016, Attorney McLaughlin and I were still discussing when GTS (and any other defendants I would eventually represent) would file a response to the Plaintiffs' petition. . . . .

> On December 16, 2016, via e-mail, I informed Attorney McLaughlin that I represented all the defendants except for Brandie Reed, Jana Grimes, John Grimes and Dallas Grant. Accordingly, on January 13, 2017, I filed an answer and counterclaims on behalf of the defendants who I represented.

Rule 119 provides the sole method for establishing a valid acceptance or waiver of service of process prior to a voluntary appearance by a defendant, presumably to prevent the kind of factual disputes concerning acceptance or waiver of service presented here. *See id.* (stating that "waiver or acceptance [in compliance with Rule 119] shall have the same force and effect as if the citation had been issued and served as provided by law"); *Spivey v. Holloway*, 902 S.W.2d 46, 48 (Tex. App.—Houston [1st Dist.] 1995, no writ) (noting that "[a]n appearance constitutes a waiver of service"). Had the Pivot Plaintiffs filed a memorandum of service in compliance with Rule 119, there would be no doubt as to whether and when opposing counsel accepted or waived service of process on behalf of GTS, Laura Grant, and Ryan Grant. In the absence of such a memorandum of service, however, the trial court could not have concluded that these defendants, or their attorney on their behalf, ever agreed to accept or waive service of process prior to the filing of their answer. *See Approximately $58,641.00 v. State*, 331 S.W.3d 579, 583-84 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *see also* Tex. R. Civ. P. 121 ("An answer shall constitute an appearance of the defendant so as to dispense with the necessity for the issuance or service of citation upon him.").

31

The record before us establishes as a matter of law that GTS, Laura Grant, and Ryan Grant validly waived service on January 13, 2017, when they voluntarily appeared and filed their answer, but not before. *See* Tex. R. Civ. P. 121. Consequently, the deadline for these defendants to file their motion to dismiss under Section 27.003(b) began to run from that date. *See* Tex. Civ. Prac. & Rem. Code § 27.003; *Jordan v. Hall*, 510 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (holding that 60-day window to file TCPA motion began to run from date on which defendant voluntarily appeared by filing answer). The GTS Defendants' motion to dismiss, filed on February 14, 2017, was timely as to these defendants.

## B. *Commercial-speech exemption*

Next, we consider whether some or all of the Pivot Plaintiffs' claims are exempt from the TCPA under the commercial-speech exemption, which states:

> This chapter does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

Tex. Civ. Prac. & Rem. Code § 27.010(b). The burden to establish the commercial-speech exemption is on the party relying on it—in this case, the Pivot Plaintiffs. *Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, Inc.*, 402 S.W.3d 299, 309 (Tex. App.—Dallas 2013, pet. denied).

The Texas Supreme Court has recently construed the scope of the commercial-speech exemption in the context of a commercial dispute. *See Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 685-91 (Tex. 2018) (per curiam). In that case, the plaintiff Castleman ran an online

32

platform in which Castleman received orders from consumers on the platform, then ordered the items from suppliers, and shipped the orders to the consumer. *Id.* The defendant, O'Connor, was hired by Castleman to "to receive and fulfill the customer orders placed through Castleman's website." *Id.*at 685. After a dispute arose over O'Connor's performance in fulfilling orders, Castleman published statements about the dispute on various online platforms including on a blog, YouTube, and social media. *Id.* O'Connor sued Castleman for defamation, and in response, Castleman filed a motion to dismiss under the TCPA. The trial court denied the motion, agreeing with O'Connor's assertion that the claims were exempt from the TCPA under the commercial-speech exemption. *Id.* After the court of appeals affirmed the decision of the trial court, the Texas Supreme Court reversed the court of appeals' judgment. *Id.* at 686.

In holding that the commercial-speech exemption did not apply to O'Connor's defamation claims, the court construed the statute and held that the commercial-speech exemption applies when:

(1)    the defendant was primarily engaged in the business of selling or leasing goods [or services];

(2)    the defendant made the statement or engaged in the conduct on which the claim is based in the defendant's capacity as a seller or lessor of those goods or services;

(3)    the statement or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant provides; and

(4)    the intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides.

33

*Id.* at 688.

The Pivot Plaintiffs argue that all of their claims are exempt under what they refer to as the "sales-exemption prong" of the commercial-speech exemption—that is, that their legal action was brought "against a person primarily engaged in the business of selling or leasing goods or services" and that "the statement or conduct arises out of the sale or lease of goods [or] services." *See* Tex. Civ. Prac. & Rem. Code § 27.010(b). According to the Pivot Plaintiffs, the commercial-speech exemption applies because (1) the GTS Defendants are primarily engaged in the business of selling "computers, peripherals, and computer-related services"; (2) the 2011 Asset Purchase Agreement and related administrative service agreements "effectuated the sale of goods and services" by the GTS Defendants to Pivot Plaintiffs; and (3) the GTS Defendants' conduct and statements that are the basis of all of the Pivot Plaintiffs' claims "arise out of these Agreements."[8] In other words, under their sales-exemption theory, the Pivot Plaintiffs argue their claims are exempt because "[a]ll of the agreements and duties that Plaintiffs allege were breached arise from the August 12, 2011 Asset Purchase Agreement and the related August 12, 2011 Administrative Services Agreement."

---

[8] The GTS Defendants contend that the Pivot Plaintiffs failed to preserve for appellate review any argument with respect to these Agreements. *See* Tex. R. App. P. 33.1 (preservation of error). The GTS Defendants point out that before the trial court, the Pivot Plaintiffs asserted that the commercial-speech exemption applied to their claims related "to the solicitation of Plaintiffs' customers in violation of specific non-compete and non-solicitation provisions [and to] attempts by Defendants to tortiously interfere with Plaintiffs' customer relations for the sole purpose of stealing those customers." Now, in post-submission briefing in this appeal, the Pivot Plaintiffs argue for the first time that, in fact, *all* of their claims fall within the commercial-speech exemption due to the Asset Purchase Agreement and the Administrative Services Agreement. For purposes of this appeal, we will assume without deciding that the issue of commercial-speech exemption has been adequately preserved by the Pivot Plaintiffs in all respects.

As the GTS Defendants point out, the Pivot Plaintiffs do not allege that the Agreements themselves effectuated a sale or lease of computer-related goods or services—the business that the Pivot Plaintiffs have identified as the business in which GTS is "primarily engaged" and which forms the basis of their claim to the commercial-speech exemption.[9] *Cf. Epperson v. Mueller*, No. 01-15-00231-CV, 2016 WL 4253978, at *11 (Tex. App.—Houston [1st Dist.] Aug. 11, 2016, no pet.) (mem. op.) (noting that defendant was "in the authentication business" and "the complained of statements arose out of those services"). Instead, in their live pleadings, the Pivot Plaintiffs describe the assets purchased by Acquisition under the Asset Purchase Agreement as "all of GTS's assets, except for a small portion of its business that required HUB status," including "[a]ll rights and benefits accruing to [GTS] under any leases, contracts or other Agreements"; "[t]he proprietary right of [GTS] related to the Business"; "[a]ll inventory"; "[a]ll receivables"; "[a]ll prepaid and deferred items of [GTS]"; "machinery, equipment, furniture, fixtures and other personal property used in the Business"; "[b]ooks of account, files, papers, records, and customer, supplier, employee and production information"; "[c]ash and cash equivalents"; "benefits under any insurance policies"; and "[t]he good will of the Business." The Pivot Plaintiffs do not specifically describe the nature of the administrative services required by GTS to Acquisition or Pivot under the "related August 12, 2011, Administrative Services Agreement," nor do they allege that the GTS Defendants failed to provide any computer-related services required by this Service Agreement.

---

[9] In their live pleadings, the Pivot Plaintiffs allege that "[a]t the time of the Asset Sale, GTS's business included the analysis, planning, design, procurement, installation and consultation related to technology products and systems."

There is no dispute that the GTS Defendants are primarily engaged in the business of selling or leasing goods or services and that, as alleged, the GTS Defendants engaged in the conduct or made the statements at issue in its capacity as a seller or lessor of goods or services. *See Castleman*, 546 S.W.3d, at 688. Consequently, only the third and fourth elements of the commercial-speech exemption are at issue. The third element of the exemption requires the plaintiff to establish, in part, that "the statement or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant provides." *Id*. Assuming without deciding that the alleged statements or conduct at issue (i.e., conduct amounting to breach) "arose out of" the Agreements themselves, as the Pivot Plaintiffs assert, the Pivot Plaintiffs have nevertheless failed to establish that the Agreements are "commercial transaction[s] involving" computer-related goods or services, "the kind of goods or services the defendant provides." *See id*. Similarly, with respect to the fourth element, the Pivot Plaintiffs have failed to demonstrate that the intended audience of the GTS Defendants' alleged statements or conduct were actual or potential customers of the GTS Defendants "for the kind of goods or services the defendant provides." *See id*. Consequently, the Pivots Plaintiffs' have failed to establish that their claims fall within the commercial-speech exemption as a result of the 2011 Agreements.

In their second argument related to the commercial-speech exemption, the Pivot Plaintiffs assert that many of their claims fall within the commercial-speech exemption because they are based on the GTS Defendants' "improper solicitations of Plaintiffs' actual or potential buyers or customers," which constitute "commercial transaction[s]" within the meaning of the Act. *See* Tex. Civ. Prac. & Rem. Code § 27.010 ("if the statement or conduct arises out of . . . a commercial

36

transaction"). According to the Pivot Plaintiffs, their petition is based on allegations that the GTS Defendants wrongfully pursued sales of their computer-related products and services to existing and potential customers of the Pivot Plaintiffs. Specifically, the Pivot Plaintiffs allege that the GTS Defendants "solicited new non-HUB work from these existing customers and solicited new non-HUB customers in the marketplace" and that this conduct constitutes a breach of non-compete and non-solicitation provisions in the parties' agreements. In addition, according to the Pivot Plaintiffs, the GTS Defendants improperly solicited customers by misappropriating a public website; confusing customers with misleading logos, names, and press releases; transferring employees to reach those employees' customer contacts; and misdirecting customers to send payments to a GTS account.

In determining whether some of the Pivot Plaintiffs' claims fall within the commercial-speech exemption, we examine the "evidence," which in this case consists of the plaintiffs' pleadings. *See id.* § 27.006. Viewing this evidence in the light most favorable to the Pivot Plaintiffs, *see Serafine*, 466 S.W.3d at 369 n.28, we conclude that the commercial-speech exemption applies to the Pivot Plaintiffs' claims of improper solicitation and competition to the extent they have alleged that the GTS Defendants engaged in communications with actual or potential Pivot customers for the purpose of securing sales of GTS goods or services. *See Abatecola v. 2 Savages Concrete Pumping*, LLC, 2018 WL 3118601, at * 9 (Tex. App.—Houston [14th Dist.] June 26, 2018, no pet. h.) (mem. op.) (concluding that commercial-speech exemption applied to tortious-interference claims based upon interference with customers where pleadings and evidence demonstrated that "alleged communications with customers took place so that [defendant] could sell concrete pumping services for compensation"). However, to the extent the Pivot Plaintiffs' claims of improper

37

solicitation and competition are based on allegations that the GTS Defendants transferred employees to reach customer contacts; misappropriated a website; and confused consumers with misleading logos, names, and press releases, we conclude that the Pivot Plaintiffs' allegations fail to establish that "actual or potential customers" were the "intended audience" of these communications and that these communications "arose out of a commercial transaction." *See Castleman*, 546 S.W.3d at 688 (requiring that "statement or conduct at issue arose out of a commercial transaction" and that "intended audience of the statement or conduct were actual or potential customers of the defendant"); *see also Better Bus. Bureau of Metro. Dallas*, 402 S.W.3d at 303-04 (holding that commercial-speech exemption did not apply because "intended audience of the business review was the general public," not an entity seeking the defendant's services). Consequently, with respect to claims based on these "solicitations," the Pivot Plaintiffs have failed to meet their burden to show that the claims fall within the commercial-speech exemption.

### C. Preemption under the Covenants Not to Compete Act

Lastly, the Pivot Plaintiffs assert that the Covenants Not to Compete Act (CNCA) precludes application of the TCPA to the extent they are seeking to enforce noncompete agreements against the GTS Defendants. *See* Tex. Bus. & Com. Code §§ 15.50-.52. The Pivot Plaintiffs argue that section 15.52 makes clear that the CNCA preempts and excludes any other procedures and remedies, including the TCPA, in an action to enforce a Texas covenant not to compete.[10]

---

[10] Section 15.52 of the CNCA, entitled "Preemption of Other Law," provides:

The criteria for enforceability of a covenant not to compete provided by Section 15.50 and the procedures and remedies in an action to enforce a covenant not to compete

38

The GTS Defendants assert, in part, that the Pivot Plaintiffs have waived the right to make this argument on appeal because they never presented it to the trial court. *See* Tex. R. App. P. 33.1 (preservation of appellate complaints). In response, the Pivot Plaintiffs contend that their argument that the CNCA preempts the TCPA with respect to certain claims has been adequately preserved for appeal because they were not required to present this specific argument to the trial court. According to the Pivot Plaintiffs, their preemption argument is encompassed in the issue of whether the TCPA applies to the Pivot Plaintiffs' claims. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 896 (Tex. 2018) (holding that TCPA movant was not required on appeal or at trial to "rely precisely on the same case law or statutory subpart" found persuasive by court).

Appellate courts do not consider issues that were not raised in the court below, but parties may construct new arguments on appeal in support of issues properly preserved. *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014). In this case, the Pivot Plaintiffs generally argued to the trial court that the GTS Defendants' TCPA motion to dismiss should be denied because (1) the Pivot Plaintiffs' claims were not based on conduct protected by the terms of the TCPA; (2) alternatively, they carried their burden under the TCPA to establish a prima facie case; (3) the GTS Defendants did not meet the time requirements for filing their motion to dismiss set forth in the TCPA; and (4) their claims fell within a statutory exemption under the TCPA. Here, for the first

---

provided by Section 15.51 of this code are exclusive and preempt any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise.

Tex. Bus. & Com. Code § 15.52.

39

time on appeal, the Pivot Plaintiffs assert that the TCPA does not apply to at least some of their claims because the claims are instead governed exclusively by a different statute, the CNCA. In other words, the Pivot Plaintiffs' preemption argument is not that a different case or subpart of the TCPA dictates a different outcome, *see Starside Custom Builders*, 547 S.W.3d at 896, but that some of their claims are governed by a different body of law altogether. *See Entergy Gulf States, Inc. v. Public Util. Comm'n*, 173 S.W.3d 199, 210 (Tex. App.—Austin 2005, pet. denied) (noting that preemption argument that affects choice of law can be waived) (citing *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 545 (Tex. 1991) (noting that preemption argument that affects choice of forum rather than choice of law is not waivable and can be raised for first time on appeal)). To preserve their argument that preemption by the CNCA serves as an alternative basis for denying the GTS Defendants' motion to dismiss, the Pivot Plaintiffs were required to present the argument to the trial court. Because they did not, we will not consider this argument on appeal.

## CONCLUSION

We conclude that the trial court erred in deciding that the TCPA does not apply to the Pivot Plaintiffs' claims. In addition, the Pivot Plaintiffs failed to meet their burden to establish a prima facie case "by clear and specific evidence" for each essential element of their claims, *see* Tex. Civ. Prac. & Rem. Code § 27.005(b), and the GTS Defendants' motion to dismiss was not untimely filed as to any of the GTS Defendants, *see id.* § 27.003(b).

We also conclude, however, that the Pivot Plaintiffs met their burden to establish that some of their claims against the GTS Defendants based on improper solicitation and competition are excluded from the TCPA under the commercial-speech exemption. *See id.* § 27.010(b). We affirm

40

the trial court's denial of the GTS Defendants' motion to dismiss with respect to these claims. In all other respects, we reverse the trial court's order denying the GTS Defendants' motion to dismiss and remand the case to the trial court to order dismissal of these claims and for further proceedings, including consideration of an award of costs, attorney's fees, and other expenses. *See id.* § 27.009.

_____

Scott K. Field, Justice

Before Justices Puryear, Field, and Bourland

Affirmed in Part; Reversed and Remanded in Part

Filed:   August 3, 2018