**AFFIRMED; Opinion Filed May 1, 2019.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-18-00729-CV**

**TAMMI STROUD, Appellant**
**V.**
**CLEARVIEW ENERGY, Appellee**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-05580**

# MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

Tammi Stroud appeals the trial court's denial of her motion under the Texas Citizens

Participation Act (TCPA) to dismiss Clearview Energy's legal action against her. *See* TEX. CIV.

PRAC. & REM. CODE ANN. § 27.001–.011. Stroud brings two issues on appeal contending (1) the

trial court erred by not applying the TCPA to this case because the evidence shows she engaged in

speech on a matter of public concern, she was terminated, and she was sued within five weeks in

response to her speech; and (2) the trial court erred by denying her motion to dismiss because

Clearview failed to present clear and specific evidence for each element of its causes of action

against Stroud. We conclude Stroud failed to show by a preponderance of the evidence that

Clearview's lawsuit against her was based on, related to, or in response to her exercise of the right

of free speech, and we affirm the trial court's order denying her motion to dismiss.

# BACKGROUND

Stroud was an employee of Clearview from at least 2012 to March 29, 2018. In 2013, Clearview suspected that Stroud was setting up a company to compete with Clearview. Clearview required her to sign a "Non-Compete Agreement," and the company paid her $500 for signing the agreement.

In 2016, Stroud, purportedly on Clearview's behalf, entered into a marketing agreement with Opsolve LLC.[1] Opsolve is based in Georgia. According to Frank McGovern, Clearview's president and CEO, Stroud lacked authority to authorize a contract without review and approval of the contract by him, the legal department, and the chief financial officer. However, Stroud presented Opsolve's invoice to Clearview's accounting department and represented that she had obtained the appropriate approvals and that the invoice should be paid. In July 2017, Stroud executed an amendment to the Opsolve agreement. She also made trips to Opsolve's offices, but she told Clearview she went to events in other states or that she was working from home. In November 2017, Clearview's officers told Stroud to terminate the Opsolve contract because it cost more than it was worth. They also told her they had learned she had executed the contract instead of the appropriate officers and that the contract had not received the required reviews and approvals. Stroud did not cancel the contract but instead signed a second amendment to it. McGovern testified the purpose of this amendment was to increase the payments to Opsolve without adding any value to Clearview. On March 7, 2018, McGovern sent an e-mail to Opsolve terminating the contract.

On March 26, 2018, Stroud and McGovern had a meeting about Stroud's concerns for the company. They then engaged in an e-mail dialogue that included, amongst other topics, Stroud's

---

[1] Clearview spells the company's name "Opsolve" while Stroud spells it "OpSolve." For the sake of consistency, we spell it Opsolve throughout the opinion regardless of how the parties spell it.

–2–

request that Clearview release her from the non-compete agreement. In Stroud's final e-mail, in which she complained to McGovern about her working conditions and the management of the company, she stated, "I do not want to walk away from Clearview, but I have a deepening need to do what's right. . . . If you have no intention of releasing me from my non-compete contract, we should discuss the terms of my separation from Clearview." Three days later, McGovern wrote her back and said Clearview would not release her from the non-compete agreement and that he accepted her resignation from Clearview.

On April 18, 2018, lawyers for Opsolve in Georgia sent a letter to Clearview demanding that Clearview pay Opsolve $1,123,697 in damages, attorney's fees, and costs for breach of contract. The letter requested a response from Clearview within ten business days. On April 27, nine days after Opsolve's demand letter, Clearview filed this lawsuit against Opsolve and Stroud. Clearview alleged Opsolve breached the contract by failing to perform the promised services, and Stroud breached her fiduciary duty to Clearview by acting in bad faith. Clearview alleged Stroud received kickbacks "for sham vendor contracts to which no performance was intended." Clearview also alleged she violated her non-compete agreement by soliciting business from Opsolve. Clearview alleged Stroud and Opsolve defrauded it and that they engaged in a conspiracy to defraud it.

Stroud timely filed a motion to dismiss Clearview's claims against her, asserting the suit was based on, related to, or in response to one of her e-mails on March 26 and that the e-mail discussed matters of public concern. After a hearing, the trial court denied Stroud's motion to dismiss.

**TEXAS CITIZENS PARTICIPATION ACT**

The TCPA permits a defendant to move for dismissal of a legal action that is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right

of association." Civ. Prac. § 27.003(a). Its purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002.

Determination of a motion to dismiss under the TCPA is a three-step process. In step one, the movant for dismissal has the burden of showing by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the movant's exercise of one of those rights. *Id.* § 27.005(b). If the movant does so, then the procedure moves to step two, and the burden of proof shifts to the plaintiff to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). If the plaintiff meets this burden, then the procedure moves to step three, and the burden of proof shifts back to the movant to "establish[] by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id.* § 27.005(d). If the plaintiff does not meet the burden in step two, or if the movant meets its burden in step three, then the trial court must dismiss the legal action, award the movant court costs, reasonable attorney's fees, and expenses incurred in defending against the legal action, and impose sanctions against the party who brought the legal action sufficient to deter the party from bringing similar actions. *Id.* §§ 27.005(b), (d), 27.009(a).

The evidence considered by the trial court in determining a motion to dismiss includes "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a). However, the plaintiffs' pleadings are "the best and all-sufficient evidence of the nature of the action." *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (quoting *Stockyards Nat'l Bank v. Maples*, 95 S.W.2d 1300, 1302 (Tex. 1936)).

## EXERCISE OF FREE SPEECH

In her first issue, Stroud contends the TCPA applies to Clearview's suit because the suit was a legal action based on, related to, or in response to Stroud's exercise of the right of free speech. *See* CIV. PRAC. § 27.005(b)(1). To be entitled to the protections of the TCPA for an exercise of the right of free speech, Stroud had to prove by a preponderance of the evidence that Clearview's lawsuit against her was a "legal action" based on, related to, or in response to a communication made in connection with a matter of public concern, meaning, in this case "an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; . . . or (E) a good, product, or service in the marketplace." *See id.* §§ 27.001(3), (7), 27.003, 27.005(b). The parties do not dispute that Clearview's lawsuit is a "legal action" or that Stroud's e-mail was a "communication." The parties disagree on whether Stroud's e-mail contained a "matter of public concern" and whether Clearview's lawsuit was based on, related to, or in response to a matter of public concern raised in the e-mail.

### The E-mails

Stroud asserts her exercise of the right of free speech was one of the e-mails she sent to McGovern on March 26. That e-mail was the third in a string of e-mails the parties exchanged. The e-mails appear to show Stroud and McGovern had met that morning to discuss Stroud's complaints including her working conditions and salary. In the first e-mail, Stroud attached a draft of an agreement mutually releasing Clearview's and Stroud's claims against each other and including a termination of Stroud's non-compete agreement.[2] In the second e-mail, McGovern

---

[2] Stroud stated in the first e-mail:

Frank,

Attached is a standard proposed non-compete release.

If we can come to terms on this today, we will not need to continue discussion on my separation from Clearview. We need to get this behind us today so we can get moving ahead tomorrow. We discussed two things that need to happen; this today, and then we can move forward with the second step, you mentioning the need for my salary increase.

–5–

expressed surprise that the agreement attached to Stroud's first e-mail was drafted so soon after their meeting, and McGovern stated Stroud "seem[ed] to be looking for the moon."[3] The third e-mail is the one Stroud asserts is her exercise of the right of free speech. That e-mail is a series of complaints about the management of the company and McGovern's treatment of her, and the e-mail ends with Stroud stating they should discuss her separation if Clearview will not terminate her non-compete agreement.

> Frank, per the letter that I printed and gave to you, and let pur [sic] conversation this morning, I'm summarizing my intent and the rationale for my need to not feel handcuffed and held down.
>
> For whatever reason, it has been hard for us to have this conversation in person with the many issues going on in the office and the busy travel schedules. I think that you do know that I have a deepening need to do what's right. I love my career; the opportunity to grow this business and the relationships that have resulted from that has given me some of the best years of my life.
>
> As a result of your recent actions, I very much feel that you are indirectly holding my non-compete over my head. Your text to me on my personal phone on Wednesday night last week at 11pm accusing me of being dishonest was completely over the line. The previous week, twice, you paraded me in front of my team via email, insinuating that I'm making bad business decisions and attacking my character. You've driven the company into the ground AGAIN, despite my very profitable and very hard to manage business unit. Your actions to correct this expense issue have almost solely affected my department and my sales vendors.
>
> Last week while I was on PTO, I had several of my vendors call me upset about phone calls that they received from you and emails that they received from our internal team. My team stayed confused and I was forced to go into repair mode to salvage everyone's sanity, and my relationships. Again.
>
> This is causing me serious stress, coupled with everything else going on at Clearview, and causing anxiety and problems in the rest of my life; vendor relations, employee relations, my reputation, etc. I get anxiety just seeing an email in my inbox with your name on it, because these emails do not at all reflect the

---

[3] McGovern replied to Stroud:

Tammi,

When we met and finished at 11:30, I did not realize when I said go through the NDA and tell me what you think you would like to take out, thinking that going to an AT&T or and American Airlines was the way you were thinking. You said you would be going to lunch with Devon and Thomas. And I saw ya'all [sic] leave about 11:38.

I see somehow a lawyer was found, this document was drafted and turned around in 26 minutes. Quick glance and it asks for a full release. Anyways, I have not reviewed in depth nor legal. I am off to the dentist.

I think you are amazing, but not sure where this is going. But you seem to be looking for the moon.

conversations that we are having.  They very much appear to be trying to back me into a corner and find a reason to prove that I'm having a performance issue.

I've told you this twice in person, (and again this morning,) but my career is completely stalled at Clearview.  I can't grow sales, I can't control attrition, my vendors are upset about slow paying them, I'm worried that the Nexxa invoices going unpaid will throw us out of regulatory compliance, I haven't had a raise in over a year, and I'm told that the majority of my bonus won't be paid "until we have cash," which is a situation that I cannot control at all.  I said that you should [sic; "not"?] consider reducing my position and even the positions in my department because without these tools, we can't be productive.  You said that I would be the last position that you would reduce and that we would be busy again in about 60 days once the cash crunch is over.  I reminded you that I can't control our bottom line cash flow position.  I can only control the revenue that you bring in from the push marketing channels in the Northeast.  Our web sales are very slim and even losing money, and Texas continues to lose money—and I have never been responsible for or given any insight into either of those channels.  We also discussed the fact that I'm making (much) less money than some of my peers who are doing much less to benefit the company and your response was that we can discuss finding a way to incentivize me for my efforts once we are out of the crunch.  My concern on this issue has much less to do with salary than it has to do with having my worth underestimated.  I have no guarantee that we will ever be out of the crunch because we are not taking the steps that I've ever recommended to avoid it.  Even if we surface, we'll be back in this position—who knows when, but this model is not sustainable at all for many reasons.  It was also hidden from me that one of my dotted-line employees would be released from his job last week.  This is either a clear disregard for my input or a blatant disrespect for my position as an executive of the company.

During the conference, we were served with a legal complaint from the Pennsylvania PUC.  I have been ridden with anxiety knowing that something like this would happen and further ruin my reputation in this industry.  I changed the company's sales pitch last year to move away from a price discussion at the door and move toward a value discussion.  In order to do that, I had to give the sales teams a platform.  That platform was Live Green.  This lawsuit is the result of efforts from a sales team that was NOT using the Live Green platform.  The majority of our complaints have been from the sales teams that were NOT using this platform.  I have struggled to maintain the teams that were using the platform because once we pulled it from use and gave them no reduction in customer rate, they were livid.  I have to present all of these efforts as my own management to the field, and that's ruining my credibility as a sales leader in this industry.  In order to testify truthfully if I am subpoenaed over this, I'll have to let them know that the quality of these agents is a direct result of our awful rates and how these third party sales teams give us their "leftovers"—the reps that can't work for valuable campaigns for a number of reasons (use your imagination.)  I would also have to defend myself once the Live Green customers start calling us wanting to know where their fulfillment items are.  Your answer to that is for us to internally fulfill to ONLY the customers that have the Live Green product name, regardless of

whether or not they were promised the program by the sales rep with leave behinds and welcome kits, and regardless of whether or not they continue to pay for the program (increased margin to pass the program costs through) which is asking me to steal the intellectual property of one of my direct vendor relationships.

Our customer rate floors for variable products, our pre-polar vortex variable rates that were never reduced, our increased margin to put our negligent expense issues on the backs of our customers, the breach of contract for the Live Green program—all of this is causing me to question my own integrity, as I'm the one having to pull the trigger on all of these items in order to keep my job and keep the company in a cash position to continue paying my salary. In fact, the meeting agenda that you sent me yesterday for today's proposed meeting mentions the 4 bulb issue again. I can already tell I'm going to be forced into becoming a product fulfillment manager.

There is clearly a struggle with my level of push-back with regard to our incredibly high variable rates that we are passing down to customers coupled with our rate floor, my struggle with breaching contracts and stealing intellectual property, and my transparent relationship with my team (that has always been encouraged at Clearview.) I am concerned that you are going to try to continue to back me into a corner or find fault with my business acumen and actions. I am incredibly restless and distraught with the entire situation; the company financial position is stressful enough, but coupled with being painted to look like any of this is in any way my fault is beyond concerning. I believe we should discuss how to remedy the situation as soon as possible, for both of our sakes.

My ask is that you release me from my non-compete contract. In return, I'll guarantee that I'll continue employment. I want to see efforts being made to rectify customer rates, fix our pitch/position in the field for sales efforts at the door, vendors paid what they are due, etc. By releasing me contractually, it gives me a personal guarantee from you that you will work with me to rectify the situation that the company is in. We can further define what this looks like. I'll also guarantee that I'll never touch your customers. I have no intention of hurting Clearview in any way. The proposed release is attached and protects us both. It simply allows us to go our separate ways, if we decide we are just not on the same path. It allows me to continue working here because I WANT to, not because I feel handcuffed, and without the pressures of being "stuck."

AGAIN—I do not want to walk away from Clearview, but I have a deepening need to do what's right. I'm beyond grateful for the opportunity that you've given me in energy; the opportunity to grow this business and the relationships that have resulted from that has given me some of the best years of my life.

If you have no intention of releasing me from my non-compete contract, we should discuss the terms of my separation from Clearview.

Thank you,

Tammi Stroud

Most of this e-mail concerns Stroud's complaints with Clearview's management, her working conditions including Clearview's failure to pay her bonuses, the quality of the sales agents she works with, and other conditions leaving her "incredibly restless and distraught with the entire situation."

In her motion to dismiss in the trial court and in her brief on appeal, Stroud explains how the e-mail (which the parties refer to as the "Stroud Letter") relates to a matter of public concern:

> The Stroud Letter to McGovern clearly involved a matter of public concern qualifying the Stroud Letter as an expression of free speech protected under the TCPA. The non-payment of vendors by Clearview, including vendors necessary to maintain Clearview's regulatory compliance and promises to consumers, undoubtedly involves the health, safety and community well being of the public as well as a good product or service in the marketplace.

(Citations omitted.) Stroud asserts in her reply brief:

> The Stroud Letter meets the definition of an exercise of free speech as defined in the TCPA. While discussing her own career concerns, the Stroud Letter alerted McGovern to financial mismanagement within the company that affected [Clearview's] ability to pay third-party vendors, and the effect that this financial mismanagement would have on [Clearview's] ability to provide energy services to the public. The Stroud Letter's discussion of the provision of energy certainly involves issues related to goods, products and services in the public marketplace. The Stroud Letter likewise discusses issues related to the provision of electricity to the public, an issue directly related to the well-being of the community.

(Citation omitted.)

Stroud's first argument is that the e-mail raised a matter of public concern because it discussed the failure to pay vendors, the failure to pay vendors would violate regulations, the violation of the regulations would affect Clearview's ability to provide electricity to the public, and the failure to provide electricity would be a matter of public concern because it would be related to health or safety, environmental, economic, or community well-being, and a good, product, or service in the marketplace. However, nothing in the e-mail or the rest of the record shows how any of Stroud's complaints concerned matters that would affect Clearview's ability to deliver electricity.

–9–

The e-mail states that Clearview's failure to pay "the Nexxa invoices" "will throw us out of regulatory compliance." However, the record does not show what service or product Nexxa provided or how the failure to pay those invoices would affect Clearview's ability to deliver electricity or any other good, product, or service in the marketplace. Neither the e-mail nor the record shows what regulation would be violated by Clearview's failure to pay Nexxa or how enforcement of that regulation would affect Clearview's ability to deliver electricity. Stroud also asserts in her briefs that the e-mail states the failure to pay vendors other than Nexxa affected Clearview's regulatory compliance. However, Stroud did not say that in the e-mail. All she said in the e-mail regarding paying the other vendors is, "my vendors are upset about slow paying them." Stroud also stated the vendors were "upset about phone calls that they received from you [McGovern] and emails that they received from our internal team," but nothing in the e-mail or the record shows how these complaints concerned Clearview's ability to deliver electricity or any other matter of public concern.

Stroud also argued her e-mail stated Clearview failed to pay "vendors necessary to maintain Clearview's . . . promises to consumers." Nothing in her e-mail or elsewhere in the record shows any unpaid vendors were necessary to fulfillment of Clearview's "promises to consumers." Furthermore, nothing in the e-mail or the record shows the nature of these promises or how they related to the provision of electricity or any other matter of public concern.

We recognize Stroud's e-mail stated Clearview was "served with a legal complaint from the Pennsylvania PUC." However, she does not argue in her brief that this "legal complaint" constituted a matter of public concern.[4] Furthermore, Stroud does not explain how this

---

[4] The "Statement of Facts" section of Stroud's brief states, "The Stroud Letter likewise detailed concerns raised in a legal complaint from the Pennsylvania Public Utility Commission and other issues related to Clearview's failure to make good on promises related to certain platforms offered to consumers." However, Stroud does not mention the PUC complaint in the argument section of her brief. Moreover, although her e-mail mentioned the Pennsylvania PUC complaint, the e-mail did not "detail[] legal concerns raised" in the complaint. The e-mail does not link the discussion about platforms to the complaint. The argument section of Stroud's brief does not mention the platforms or explain how the discussion of the platforms constituted a matter of public concern.

–10–

"complaint" affected Clearview's ability to deliver electricity or otherwise related to an issue of health or safety, environmental, economic, or community well-being, or a good, product, or service in the marketplace.

Stroud's argument also states her e-mail discusses "the provision of energy" and "issues related to the provision of electricity to the public." However, Stroud's e-mail does not mention the provision of energy or electricity. The e-mail mentions "awful rates," "fulfillment items," "leave behinds," "welcome kits," "variable products," "variable rates," "negligent expense issues," and "the 4 bulb issue." But the record contains no explanation of what these items are or how they relate to the provision of energy or electricity or any other matter of public concern.

We conclude Stroud failed to show by a preponderance of the evidence that her e-mail related to any issue of public concern. Therefore, Stroud failed to show by a preponderance of the evidence that her e-mail constituted an exercise of her right to free speech.[5]

**Legal Action Based on, Related to, or in Response to Exercise of Right of Free Speech**

Stroud also had the burden of proving by a preponderance of the evidence that Clearview's lawsuit was based on, related to, or in response to the exercise of the right of free speech. *See* CIV. PRAC. § 27.005(b). To meet this requirement, the movant for dismissal must establish a nexus between the legal action and the movant's exercise of the protected right. *Dyer v. Medoc Health Servs., LLC*, No. 05-18-00472-CV, 2019 WL 1090733, at *7 (Tex. App.—Dallas Mar. 8, 2019, pet. filed); *Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 879 (Tex. App.—Austin 2018, pet. filed). "[T]o trigger the TCPA's protection, the 'legal action' must be 'factually predicated on the alleged conduct that falls within the scope of [the] TCPA's definition of 'exercise of the right of

---

[5] Although we conclude Stroud failed to show her e-mail contained issues related to a matter of public concern, we observe the e-mail contains statements we have not addressed because Stroud did not argue them. We make no determination of whether those statements might be related to a matter of public concern.

free speech,' petition, or association." *Dyer*, 2019 WL 1090733, at \*7 (quoting *Grant*, 556 S.W.3d at 879).

Clearview's petition sued Opsolve for breach of contract alleging Opsolve agreed to provide product-marketing services, including Opsolve's software application called Greencents, "branding and setup for Clearview," website hosting, and software maintenance. Clearview paid Opsolve $467,819.25, but "Opsolve had never provided any equipment, labor, accessibility to its software platform, or any professional services or training in support of its uses; Clearview had no records so far on any marketing communications or product fulfillments sent to their clients; and Opsolve had never provided any comprehensive report on its Greencents or any other marketing campaign status."

The petition contained a fraud cause of action against Stroud and Opsolve, and it appears to allege that Opsolve compensated Stroud for obtaining the marketing agreement and its amendments. The cause of action alleged Opsolve and Stroud did not intend for Opsolve to perform under the contract. Clearview sought as damages from Stroud and Opsolve the $467,819.25 it had paid Opsolve, and Clearview also sought exemplary damages.

Clearview also alleged Stroud breached her fiduciary duty to Clearview when she "acted in bad faith and for the purpose of benefiting herself. Upon information and belief, she received various kickbacks in exchange for sham vendor contracts to which no performance was intended," while Clearview paid significant sums of money to "these sham vendors."

Clearview also alleged Stroud breached the non-compete agreement because her actions were in violation of the agreement's non-solicitation clause. Clearview requested that the court enter an injunction barring Stroud from contacting Clearview's vendors, customers, or competitors and from doing business with Opsolve.

Thus, Clearview's claims against Stroud were that she committed fraud, breached her fiduciary duty to Clearview, and violated the non-compete agreement by conspiring with Opsolve to get Opsolve's marketing agreement approved by Clearview, for Opsolve to provide no product or services to Clearview, and for Clearview to pay Opsolve hundreds of thousands of dollars for which Stroud received compensation from Opsolve.

Stroud asserts on appeal that paragraph 9 of Clearview's petition shows the petition was filed in response to the e-mail. Paragraph 9 was in the "Background Facts" section of the petition, and it alleged:

> 9. In [sic] March 29, 2018, Defendant Stroud resigned from Clearview and based upon the actions taken by Defendant Stroud and Defendant Opsolve, upon information and belief, Defendant Opsolve was, and is, providing Defendant Stroud with benefits and compensation based in whole, or in part, upon the compensation received by Opsolve based upon the actions of Defendant Stroud in obtaining the original marketing contract and the amendments to such marketing agreement.

Stroud appears to argue the petition's reference to her resignation relates the petition to her e-mail. Although the petition may, to the extent of Stroud's resignation, be "related" to the e-mail, nothing in the record shows her resignation was a matter of public concern. Therefore, any relation of the suit to her resignation does not make the suit a legal action based on, related to, or in response to Stroud's exercise of free speech.[6]

Stroud also argues the timing of the petition—filed thirty-two days after her e-mail—shows the suit was in response and relates to the e-mail. However, there is contrary evidence. McGovern testified in his affidavit that Clearview received a demand letter dated April 18, 2018 from Opsolve's attorneys requesting a response within ten business days, i.e., by May 2, 2018.

---

[6] Stroud also asserts that Clearview's petition "expressly state[s] Clearview's 'belief' that the Stroud letter . . . was part of a ruse that involved Stroud engaging in a fraud and conspiracy to commit fraud on Clearview as well as Stroud breaching her fiduciary duties and non-compete obligations owed to Clearview." Nowhere does the petition "expressly" mention Stroud's e-mail, much less allege that the e-mail "was part of a ruse." Stroud cites to page 11 of the clerk's record for her assertion. That page is the third page of the petition and includes paragraph 9, quoted above. The only "belief" stated on that page is that set forth in paragraph 9. That "belief" was that Opsolve was paying Stroud for having obtained the marketing agreement with Opsolve and the agreement's amendments. Stroud does not explain how that belief concerns any matter of public concern expressed by Stroud in the e-mail.

–13–

McGovern stated, "Therefore, on May 1, 2018, Clearview initiated this action, such initiation and timing was based solely upon the demand letter from Defendant Opsolve's legal counsel." Stroud points out that Clearview filed suit on April 27, not May 1. However, regardless of McGovern's truthfulness regarding the date suit was filed, that misstatement does not affect his evidence that the initiation and timing of the suit were "based *solely* upon the demand letter from Defendant Opsolve's legal counsel." (Emphasis added.)

We conclude Stroud failed to show by a preponderance of the evidence that her e-mail was "made in connection with a matter of public concern." CIV. PRAC. § 27.001(3). We further conclude Stroud failed to show by a preponderance of the evidence that Clearview's lawsuit against her was based on, related to, or in response to any matter of public concern expressed in the e-mail. Therefore, the trial court did not err by not applying the TCPA or by denying Stroud's motion to dismiss. We overrule Stroud's first issue.

Having overruled the first issue, we do not address Stroud's second issue contending Clearview failed to establish a prima facie case with clear and specific evidence for each element of its causes of action. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

We affirm the trial court's order denying Stroud's motion to dismiss.

/Lana Myers/
LANA MYERS
JUSTICE

180729F.P05

–14–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

TAMMI STROUD, Appellant

No. 05-18-00729-CV     V.

CLEARVIEW ENERGY, Appellee

On Appeal from the 14th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-18-05580.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

In accordance with this Court's opinion of this date, the order of the trial court denying appellant Tammi Stroud's motion to dismiss is **AFFIRMED**.

It is **ORDERED** that appellee CLEARVIEW ENERGY recover its costs of this appeal from appellant TAMMI STROUD.

Judgment entered this 1st day of May, 2019.