# Supreme Court of Texas

═══════

No. 21-0641

═══════

McLane Champions, LLC and R. Drayton McLane, Jr.,

*Petitioners,*

v.

Houston Baseball Partners LLC,

*Respondent*

═══════════

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

═══════════

**Argued October 25, 2022**

JUSTICE LEHRMANN delivered the opinion of the Court, in which Justice Boyd, Justice Devine, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

CHIEF JUSTICE HECHT filed a dissenting opinion, in which Justice Blacklock joined.

JUSTICE BLACKLOCK filed a dissenting opinion.

The Texas Citizens Participation Act provides special procedures allowing parties to obtain early dismissal of meritless claims that implicate the exercise of the rights of free speech, association, and petition. The principal issue in this case, which arises out of the 2011

sale of the Houston Astros, is whether the Act applies to this dispute between private parties to a private business transaction that later generated public interest. The court of appeals assumed that the Act applies, but it held that the plaintiff had met its burden to avoid dismissal and affirmed the trial court's denial of the defendants' motion to dismiss. We hold that the Act does not apply in the first instance. Accordingly, while we express no opinion on the merits of the plaintiff's claims, we affirm the court of appeals' judgment.

## I. Background

In May 2011, Houston Baseball Partners LLC (Partners), led by Jim Crane, entered into an agreement to purchase the Houston Astros from McLane Champions, LLC (Champions). Surprising as it may seem now, the Astros were struggling both competitively and financially at the time.[1] When Partners purchased the club, the Astros were approximately $200 million in debt and continuing to lose money.

The deal included not only the team, but also the Astros' interest in a soon-to-be-launched regional sports network. The Astros had formed the Network with the Houston Rockets to broadcast their games and related content to viewers in the Greater Houston area.

---

[1] Since the sale closed in November 2011, the Astros have become one of the most consistently successful teams in baseball, playing in four World Series in six years and winning two. *See, e.g.*, Bradford Doolittle, *Dynasty! Love 'em or Loathe 'em, the World Series Champion Astros Are an All-time Team*, ESPN (Nov. 5, 2022, 11:17pm), https://www.espn.com/mlb/story/_/id/34957834/2022-world-series-houston-astros-mlb-dynasty (discussing team history).

In October 2010, a Comcast Corporation affiliate invested $157.5 million to purchase a 22.5% equity interest in the Network, which was scheduled to launch in October 2012. In addition to its substantial financial investment, Comcast agreed to leverage its experience in launching regional sports networks and negotiating with cable and television service providers to help profitably launch the Network. Given the Astros' financial position, Partners alleges it viewed the club's interest in the Network as the key asset it was acquiring.

The Astros, the Rockets, and Comcast developed a business plan for the Network to project its expected profitability after launch. Affiliate rates—the fees cable and satellite television providers pay a channel for the right to carry it on their cable or satellite service—would primarily drive the Network's revenues. The affiliate rates underlying the business plan divided potential cable and satellite viewers into geographic zones. The plan assumed that cable and satellite providers would pay a higher affiliate rate for viewers living closer to downtown Houston. As a result, the plan's highest rate applied to potential viewers living in the immediate Houston vicinity.

As a starting point, the business plan used the affiliate rates Comcast had agreed to pay as a "market clearing" rate that other providers would also likely pay. Based on these inputs, Partners valued the Network at around $714 million. This meant that the Astros' interest in the Network was worth around $332 million.

Whether Comcast's affiliate rates were truly market clearing was crucial to the viability of the Network's business plan. Although Comcast had agreed to the rates underpinning the plan, Comcast's

3

agreement also included a "Most Favored Nation" clause. Pursuant to that clause, if the Network signed agreements with other providers at lower affiliate rates, Comcast would be entitled to reduce its own affiliate rates to equal those lower rates. Consequently, less favorable affiliate agreements could have a snowball effect on the Network's revenues, severely undermining the business plan's viability.

Partners focused much of its due diligence on confirming the Network's valuation. Because the affiliate rates formed the foundation for the business plan, Partners asserts that how those rates were calculated—and who proposed them—was critical to assessing the business plan's viability.

Partners alleges that Champions' investment bank, Allen & Company, informed Partners that Comcast had proposed the input affiliate rates, that Comcast believed those rates were reasonable and achievable, and that Comcast expected the Network would be able to enter into affiliate agreements with other providers at equivalent rates. On April 12, 2011, Partners met with a Comcast executive who purportedly confirmed each of these representations.

Based primarily on its valuation of the Astros' interest in the Network, Partners agreed to purchase the Astros from Champions for over $615 million. Shortly after signing the Purchase and Sale Agreement in May 2011, Partners assigned all its rights under the agreement to a wholly owned subsidiary—HBP Team Holdings, LLC (Holdings). Champions, Partners, and Holdings also executed an amendment to the purchase agreement defining Holdings as the Purchaser. However, the agreement's indemnity provision identified

4

affiliates, direct owners, and indirect owners of the Purchaser as "Seller Indemnified Parties." Accordingly, Partners remained a Seller Indemnified Party even after the assignment, and Champions agreed to indemnify such parties for breaches of the purchase agreement.

When the Network launched in 2012, it had not signed affiliate agreements with any providers besides Comcast. Those affiliate agreements that Comcast was able to deliver with other providers post-launch contained affiliate rates far below those outlined in the business plan. Accepting those offers would trigger Comcast's Most Favored Nation clause, lowering the affiliate rates it was required to pay. The Network quickly fell into severe financial distress and was unable to pay media-rights fees to the Astros. Comcast filed an involuntary bankruptcy petition against the Network in September 2013.

As the Network collapsed in December 2012, Partners met with Comcast executives to discuss the Network's alarming financial position. At the meeting, a Comcast executive allegedly admitted that Comcast had always known the Network's business plan was unreasonable and had told the Astros as much well before the purchase agreement's closing. In particular, Comcast first revealed its misgivings about the business plan in 2010. Comcast also allegedly revealed that the affiliate rates that formed the foundation for the plan were proposed by the Astros and the Rockets, not Comcast.

In November 2013, Partners sued Comcast, Champions, and Champions' owner R. Drayton McLane, Jr. for fraud, negligent misrepresentation, and civil conspiracy. Partners also brought breach-

of-contract claims against Champions and McLane.[2] Partners' fraud and misrepresentation claims are primarily based on the alleged December 2012 revelations that the Astros and the Rockets, not Comcast, originally proposed the affiliate rates and that Comcast and the Astros had always known that the Network's business plan was unreasonable. Comcast removed the case to the bankruptcy court where the Network's involuntary bankruptcy was pending. The bankruptcy court determined that the case should be remanded to state court; over five years after that order was appealed, the district court affirmed and remanded the case.

Within three weeks of remand, Champions moved to dismiss Partners' claims under the Texas Citizens Participation Act (TCPA). Comcast joined the motion, which also challenged Partners' standing to sue on the ground that only Holdings had an interest under the purchase agreement. In response, Holdings intervened and filed counterclaims against Champions and third-party claims against Comcast identical to those Partners asserted. The trial court denied the TCPA motion.

The court of appeals affirmed. 627 S.W.3d 398, 405 (Tex. App.—Houston [14th Dist.] 2021). The court of appeals first held that Partners had standing to sue despite its assignment of rights under the purchase agreement to Holdings. *Id.* at 412. Assuming without deciding that the TCPA applied to Partners' claims, the court then held that Partners had

[2] Unless necessary for context, we refer to Champions and McLane collectively as Champions.

6

made a prima facie showing for each of its claims by clear and specific evidence. *Id.* We granted Champions' petition for review.[3]

## II. Discussion

In this Court, Champions continues to challenge Partners' standing, asserts that the TCPA applies to Partners' claims, and argues that Partners failed to meet its burden to avoid dismissal. We address these issues in turn.

## A. Standing

As an initial matter, Champions argues that Partners lacks standing to sue—and the courts thus lack subject matter jurisdiction over Partners' claims—because Partners assigned all its rights under the purchase agreement to Holdings. Partners responds that Champions is challenging its capacity to sue, not standing in the true constitutional, and jurisdictional, sense of the term.

Lack of constitutional standing deprives the trial court of subject matter jurisdiction. *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 773 (Tex. 2020). Because standing is a threshold jurisdictional issue that "is essential to a court's power to decide a case," we address that issue before turning to the substance of the TCPA motion. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000) ("The absence of subject-matter jurisdiction may be raised by a plea to the jurisdiction, as well as by other procedural vehicles . . . ."); *see also Buzbee v. Clear Channel*

---

[3] Comcast and its subsidiary, NBCUniversal Media, LLC, also petitioned for review; however, Partners nonsuited its claims against those parties after oral argument, and we dismissed Comcast's petition.

7

*Outdoor, LLC*, 616 S.W.3d 14, 22 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (addressing standing issue raised in a TCPA motion to dismiss).

To show constitutional standing, a plaintiff must demonstrate that: (1) it suffered a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision is likely to redress the injury. *In re Abbott*, 601 S.W.3d 802, 808 (Tex. 2020). Partners easily satisfies these requirements. Partners presented evidence that it transferred over $300 million of its own money—and obligated itself to repay additional bank loans—to fund the purchase of the Astros, a textbook "pocketbook injury." *See Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). Partners further alleges that it paid a bloated purchase price in reliance on Champions' material misrepresentations. And Partners seeks to recover money damages to redress its injury.

Champions nevertheless contends that Partners' assignment of its rights under the purchase agreement to Holdings deprives Partners of standing to sue because all its claims arise out of that purchase. Our recent precedent confirms, however, that such "extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit" do not implicate standing in the jurisdictional sense. *Dyer v. Tex. Comm'n on Env't Quality*, 646 S.W.3d 498, 505 n.36 (Tex. 2022) (quoting *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021)). Stated differently, "a plaintiff does not lack standing simply because some other legal principle may prevent it from prevailing on the merits; rather, a plaintiff lacks standing if its claim of injury is too slight for a court to afford redress." *Data Foundry, Inc. v.*

*City of Austin*, 620 S.W.3d 692, 696 (Tex. 2021) (internal quotation marks omitted); *see also Nat'l Health Res. Corp. v. TBF Fin., LLC*, 429 S.W.3d 125, 128–29 (Tex. App.—Dallas 2014, no pet.) ("Whether a party is entitled to sue on a contract is not truly a standing issue because it does not affect the jurisdiction of the court; it is, instead, a decision on the merits." (internal quotation marks omitted)).

Here, the legal principle Champions raises that may prevent Partners from recovering is its capacity to sue on the purchase agreement—that is, its "legal authority to act" despite the assignment. *Pike*, 610 S.W.3d at 775 ("A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." (citation omitted)). And the assignment may (or may not) affect Partners' ability to recover damages from Champions. But it does not affect Partners' constitutional standing and thus does not call into question the court's subject matter jurisdiction.[4] *See id.* at 774. At this stage of the litigation, we need not inquire further into the assignment's impact on Partners' claims. Accordingly, we turn to the applicability of the TCPA to those claims.

---

[4] We are aware that because the parties dispute the scope of the assignment in the purchase agreement, they at times distinguish between Partners' tort and contract claims. And while we have said before that "standing must be analyzed claim by claim," *Tex. Propane Gas Ass'n v. City of Houston*, 622 S.W.3d 791, 800 (Tex. 2021), we need not do so here. The scope of the assignment may affect Partners' capacity, but it does not change the fact that Partners' claims all arise from the same pocketbook injury.

9

## B. Applicability of the TCPA

The Legislature enacted the TCPA "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE § 27.002; *see also Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018) (explaining that the TCPA protects persons who associate, petition, or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them).[5]  The statute provides this protection by authorizing a motion to dismiss early in the covered proceedings, subject to expedited interlocutory review. *See* TEX. CIV. PRAC. & REM. CODE §§ 27.003, .008.  Trial courts review TCPA motions to dismiss in a multi-step analysis.  First, the moving party must show by a preponderance of the evidence that the TCPA applies to the legal action against it. *Id.* §§ 27.003, .005(b).  If the moving party satisfies that burden, the burden shifts to the nonmoving party to establish by clear and specific evidence a prima facie case for each essential element

---

[5] The TCPA was enacted in 2011 and amended in 2013 and 2019. *See* Act of May 24, 2011, 82d Leg., R.S., ch. 341, 2011 Tex. Gen. Laws 961, 961–64, *amended by* Act of May 27, 2013, 83d Leg., R.S., ch. 1042, 2013 Tex. Gen. Laws 2499, 2499–2500, *and* Act of May 20, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Gen. Laws 684, 684–87.  Unless otherwise noted, all references to the statute are to the applicable 2013 version.

of its claim.  *See id.* § 27.005(c).  If the nonmoving party cannot satisfy that burden, the trial court must dismiss the suit.  *Id.*[6]

In this case, our analysis begins and ends with the first step: whether the TCPA applies to this action.  Under the TCPA, a party may file a motion to dismiss if a legal action is based on, related to, or in response to that party's exercise of the right of free speech, right to petition, or right of association.  *Id.* § 27.003(a).  Champions argues that Partners' lawsuit is based on or in response to Champions' exercise of both the right of free speech and the right of association.[7]  We address each assertion in turn.

### 1. Free Speech Under the TCPA

The TCPA defines "exercise of the right of free speech" as "a communication made in connection with a matter of public concern."  *Id.* § 27.001(3).  The operative version of the TCPA defined "matter of public

---

[6] Under the operative version of the statute, if the nonmoving party makes the required prima facie showing, the trial court must still dismiss the action if "the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim."  TEX. CIV. PRAC. & REM. CODE § 27.005(d).

[7] In addition to disputing those arguments, Partners argues as alternative grounds for affirmance that (1) the motion to dismiss was untimely and (2) the TCPA does not apply because the action falls within the Act's "commercial speech" exemption.  *See id.* § 27.010(a)(2) (providing that the TCPA does not apply to a legal action "against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer").  Because we agree with Partners' primary argument, we need not address the motion's timeliness or the commercial-speech exemption's applicability.

concern" to "include[] an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id.* § 27.001(7). The Legislature's 2019 TCPA amendments modified the definition of "matter of public concern";[8] however, the amendments left the definition of "exercise of the right of free speech" unaltered. *See* Act of May 20, 2019, 86th Leg., R.S., ch. 378, § 1, 2019 Tex. Gen. Laws 684, 684–85.

We have construed the TCPA's overarching phrase "communication made in connection with a matter of public concern" in a broad, but not limitless, manner. Accordingly, we have held that some—but certainly not all—private communications may be made in connection with a matter of public concern and thus subject to a TCPA motion to dismiss.

In *Lippincott v. Whisenhunt*, for example, we held that the TCPA applied to defamation claims based on a hospital employee's emails discussing a nurse anesthetist's allegedly substandard medical services, even though the statements were not publicly communicated. *See* 462 S.W.3d 507, 509–10 (Tex. 2015) (noting that the TCPA broadly defines "communication" to include any medium, regardless of whether it takes

---

[8] The TCPA now defines "matter of public concern" as "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." Act of May 20, 2019, 86th Leg., R.S., ch. 378, § 1, 2019 Tex. Gen. Laws 684, 684–85 (codified at TEX. CIV. PRAC. & REM. CODE § 27.001(7)).

a public or private form). We explained that the provision of medical services by a health care professional constitutes a matter of public concern—it implicates issues of health and safety, community well-being, and services in the marketplace. *Id.* at 510. Further, the challenged communications related to the quality of a particular professional's medical services to his patients. *Id.* Accordingly, the communications fell squarely within the exercise of the right of free speech under the TCPA. *See id.*

Relying on *Lippincott*, we similarly held that the TCPA applied to defamation claims brought against a former employer in *ExxonMobil Pipeline Co. v. Coleman. See* 512 S.W.3d 895, 900 (Tex. 2017). Coleman, the employee, was fired after he purportedly failed to record the fluid volume of various storage tanks as required and then falsely reported that he had complied with the requirement. *Id.* at 897. Coleman alleged that two of his supervisors made false statements about the incident—including in a formal written report—during the company's internal investigation. *Id.* Importantly, uncontroverted testimony established the safety and environmental risks posed by failing to follow the applicable protocol as well as the fact that the report was prepared, in part, for use as a learning tool at monthly safety meetings. *Id.* We thus concluded that the challenged statements, "although private and among [company] employees, related to a 'matter of public concern' because they concerned Coleman's alleged failure to [follow a process intended], at least in part, to reduce the potential environmental, health, safety, and economic risks associated with noxious and flammable chemicals overfilling and spilling onto the ground." *Id.* at 901.

13

More recently, we elaborated on the limits of the TCPA's broad reach in *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, in which an oil-and-gas lessee claimed that the lessor falsely told third-party purchasers of production from the lease that the lease had terminated for cessation of production. 591 S.W.3d 127, 130 (Tex. 2019). The lessor moved to dismiss, arguing that its statements to the purchasers were an "exercise of the right of free speech" under the TCPA because they related to "a good, product, or service in the marketplace"—specifically, "the [oil and gas] lease and its products." *Id.* at 134. We disagreed, clarifying that "not every communication related somehow to one of the broad categories set out in section 27.001(7) always regards a matter of public concern." *Id.* at 137.[9] Noting that the communications involved "a limited business audience" and concerned a "private contract dispute affecting only the fortunes of the private parties involved," *id.* at 136–37, we held that the communications were not made in connection with "a 'matter of public concern' under any tenable understanding of those words," *id.* at 137.

Taken together, these cases demonstrate that communications that are merely "related somehow to one of the broad categories" set out in the statute but that otherwise have no relevance to a public audience are not "communications made in connection with a matter of public concern." *Id.*; *see Goldberg v. EMR (USA Holdings) Inc.*, 594 S.W.3d 818, 828 (Tex. App.—Dallas 2020, pet. denied) (citing *Creative Oil* and

---

[9] With this limitation, we necessarily cabined our statement in *Coleman* that the TCPA does not "require more than a 'tangential relationship' to" the public concerns identified in the statute. 512 S.W.3d at 900.

14

noting that "the communications *themselves* must relate to a matter of public concern" (emphasis added)). To be sure, private communications can implicate the right of free speech under the TCPA, but in both *Lippincott* and *Coleman* the communications at issue, while made privately, held some relevance to a public audience when they were made. *See Lippincott*, 462 S.W.3d at 509–10; *Coleman*, 512 S.W.3d at 898.

Construing the TCPA to cover communications that hold some relevance to a public audience when they are made is also more consistent with the ordinary meaning of the phrase "in connection with." The TCPA does not define that phrase. Merriam-Webster, however, defines it as an idiomatic expression meaning "for reasons that relate to (something)." *In connection with*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/in%20connection%20with (last visited June 28, 2023). The definition indicates the two connected things are relevant to each other and provides an example that fleshes this idea out: "Police arrested four men *in connection with* the robbery." *Id.* The arrest has some relevance to "the robbery," not the crime of robbery in the abstract.

Likewise, under the TCPA, the communication on which the suit is based must have some relevance to a public audience. Absent this limiting principle, grounded in the statute's text, the TCPA would apply to communications made as part of any private business deal involving any industry that impacts economic or community well-being. It does not. *Creative Oil*, 591 S.W.3d at 136; *see also TotalGen Servs., LLC v. Thomassen Amcot Int'l, LLC*, No. 02-20-00015-CV, 2021 WL 210845, at

15

*4 (Tex. App.—Fort Worth Jan. 21, 2021, no pet.) (holding that the TCPA did not apply to a breach-of-contract claim premised on disclosure of confidential information in conjunction with the sale of power generators because "the communications at issue involved nothing more than an exclusively private, arm's-length transaction between private parties involving confidential and proprietary information about the seller and equipment," and "nothing in the alleged communications addresse[d] a public component or the bigger picture of power generation generally").

Further, the statute's plain terms impose a temporal anchor on the relationship between the communication and the matter of public concern: the "connection" between the communication and the matter of public concern must exist when the communication is made. TEX. CIV. PRAC. & REM. CODE § 27.001(3) (defining "exercise of the right of free speech" as "a communication *made* in connection with a matter of public concern" (emphasis added)). That is, a communication cannot be made in connection with a matter of public concern unless it had relevance to a public audience at the time it was made, regardless of the happenstance of after-the-fact ramifications. *See id.*

Importantly, this construction harmonizes the various statutory definitions with the TCPA's express purpose: safeguarding constitutional rights while simultaneously protecting plaintiffs' rights to file meritorious lawsuits for demonstrable injuries. *See id.* § 27.002. While we have held that the TCPA is not limited in application to constitutionally guaranteed activities, the purpose still provides context for the statute's definitions. *Youngkin*, 546 S.W.3d at 681; *see also Dall.*

16

*Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019) (noting that the TCPA "is a bulwark against retaliatory lawsuits meant to intimidate or silence citizens on matters of public concern"). Giving full effect to the statute's temporal anchor, and to the required relevance to a public audience, ensures that the TCPA is not transformed into a far-reaching procedural mechanism for obtaining early dismissal of cases well beyond the statute's express purpose.

With this, we turn to the specific communications underlying Partners' suit and their connection to a matter of public concern when made. Partners bases its claims solely on private business negotiations in an arms-length transaction subject to a nondisclosure agreement. In particular, Partners' suit focuses on Champions' alleged assertions during the negotiations that Comcast—not the Astros and Rockets—proposed the affiliate rates that formed the foundation for the Network's business plan, that those affiliate rates were market clearing, that Comcast believed that those rates were reasonable, and that the business plan was achievable. Each of these assertions was relevant to the price Partners was willing to pay for the Astros. But the fact that the statements were, broadly speaking, about a network that would carry Astros games, and the fact that the public has a general interest in the Astros, does not mean that the statements were made in connection with a matter of public concern under the TCPA. *See Creative Oil*, 591 S.W.3d at 137; *Blue Gold Energy Barstow, LLC v. Precision Frac, LLC*, No. 11-19-00238-CV, 2020 WL 1809193, at *7 (Tex. App.—Eastland Apr. 9, 2020, no pet.) (noting that "communications do

17

not become a matter of public concern simply based on the nature of the parties' business").

The dissent acknowledges that the alleged misrepresentations at issue are "of a type that could occur in the analysis of any asset and its potential," which "happens every day and is usually important only to the parties involved—rarely to the public." *Post* at 4 (Hecht, C.J., dissenting). Here, however, the dissent finds a "direct" link between the misrepresentations at issue and the community's well-being. *Id.* at 5. Specifically, the dissent relies on Partners' allegation that Astros fans have also been injured because

> [Champions'] misrepresentations leave [Partners] with an impossible choice: either accept the broken network as is, and deprive thousands of fans the ability to watch Houston Astros games on their televisions, or distribute the games at market rates and take massive losses out of the Houston Astros player payroll—thereby dooming the franchise for years to come.

*Id.* at 4–5.

We disagree with the dissent's assessment of Partners' claim. The allegation is that the misrepresentations left *Partners* with the consequences of a broken network because they led Partners to purchase the team and its interest in that broken network. And assuming the allegations are true, the "impossible choice" on which the dissent bases its matter-of-public-concern analysis was inevitable. According to Partners, the Network's failure was inevitable and Champions knew it. Either Partners would purchase the team and its interest in the Network, and the Network was doomed to fail under Partners' ownership, or Champions would remain the owner, and the Network

18

was doomed to fail under Champions' ownership. The effect on the public writ large—namely, that the local professional sports team would be saddled with a failed regional sports network—was the same. Who would eventually take the financial loss associated with the Network's failure was relevant only to the parties that could end up holding the bag: Champions and Partners.

Again, the core of Partners' complaint is that the actual value of the asset it purchased was substantially less than Champions represented and that it was induced by those representations to pay an inflated purchase price. Thus, Champions made the alleged misrepresentations to Partners "in connection with" the negotiation of a purchase price; the communications were relevant to Partners' valuation of the Network and the price Partners was willing to pay to purchase the Astros—a matter of private, not public, concern. By contrast, the communications at issue in *Coleman* about the employee's failure to follow protocols designed to decrease the environmental and safety risks associated with chemical spills, 512 S.W.3d at 901, and the communications at issue in *Lippincott* about the substandard quality of a health professional's treatment of patients, 462 S.W.3d at 509–10, had a clear connection to, and were made for reasons that relate to, public health and safety.

As discussed, under the dissent's overly broad view, the TCPA and its accompanying dismissal procedures would apply to any suit involving any communication about any economically important entity. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(7)(B) (defining "matter of public concern" to include "an issue related to . . . environmental,

19

economic or community well-being").[10] The dissent downplays this ramification, opining that requiring a plaintiff to produce prima facie evidence early in the litigation process is a justifiable hardship and that we have provided for early dismissal of baseless causes of action in some circumstances through our own Rules of Civil Procedure. *Post* at 12–13 (Hecht, C.J., dissenting); *see* TEX. R. CIV. P. 91a (providing for dismissal of a cause of action based on the pleadings "on the grounds that it has no basis in law or fact"). Perhaps this is correct as a matter of policy, but judicial policy preferences should play no role in statutory interpretation. *See Iliff v. Iliff*, 339 S.W.3d 74, 80 (Tex. 2011). The fact that other procedural mechanisms allow for early dismissal of meritless lawsuits has no bearing on whether the TCPA provides such an escape hatch here.

In sum, the alleged misrepresentations were made in connection with negotiations to close the purchase and sale of the Astros and its interest in the Network at a favorable price. And the result is a garden-variety fraud and breach-of-contract dispute between a private buyer and a private seller regarding statements made during a private negotiation that have nothing to do with "the constitutional rights of

---

[10] Indeed, following the dissent's view to its logical conclusion produces results bordering on the absurd. Say, for example, a rich and famous woman and her brother buy a vacation home as tenants-in-common. After a few years, they decide to sell. The vacation home's buyer discovers a foundation problem after the sale and sues the previous owner, alleging that the presale disclosures misrepresented the house's structural integrity. Under the dissent's view, the TCPA arguably applies to the buyer's claim against the rich and famous woman but not to the buyer's claim against the brother. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(7)(D) (defining "matter of public concern" to encompass an issue regarding a public figure).

persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." TEX. CIV. PRAC. & REM. CODE § 27.002. That the subject of the purchase agreement—a professional sports team—is generally of public interest does not render the specific communications at issue relevant to a public audience when they were made. As a result, we hold that the communications were not "made in connection with a matter of public concern" under the TCPA.

## 2. Right of Association Under the TCPA

The operative version of the TCPA defined "exercise of the right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *See* Act of May 24, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 961. The Legislature substantially amended this definition in 2019, and the TCPA now defines the term as "to join together to collectively express, promote, pursue, or defend common interests *relating to a governmental proceeding or a matter of public concern.*" Act of May 20, 2019, 86th Leg., R.S., ch. 378, § 1, 2019 Tex. Gen. Laws 684, 684 (codified at TEX. CIV. PRAC. & REM. CODE § 27.001(2) (emphasis of amended language added)).

The courts of appeals are divided on when a communication between individuals impinges on the exercise of the right of association under the pre-2019 version of the TCPA. The split focuses on whether an alleged conspiracy can constitute the "common interest" that individuals join together to express, promote, pursue, or defend, thereby implicating the TCPA. *Compare Gaskamp v. WSP USA, Inc.*, 596

21

S.W.3d 457, 475 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (defining "common interest" to require that the object or purpose of the protected conduct relate to a governmental proceeding or a matter of public concern),[11] *with Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 878 (Tex. App.—Austin 2018, pet. denied) (holding that the "common interests" element of the exercise of the right of association is satisfied by the private business interests being advanced through alleged tortfeasors' tortious conduct).[12] The 2019 amendments to the TCPA, which do not apply here, have resolved this split for future cases by redefining the exercise of the right of association to clarify that the common interest parties join together to collectively express, promote, pursue, or defend must relate to a governmental proceeding or a matter of public concern. *See* Act of May 20, 2019, 86th Leg., R.S., ch. 378, § 1, 2019 Tex. Gen. Laws 684, 684.

The word "common" has a variety of meanings. These include: (1) "belonging to, open to, or affecting the whole of a community or the public"; and (2) "shared by, coming from, or done by more than one." *Common*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010). The first definition supports the *Gaskamp* court's interpretation, *see* 596 S.W.3d at 475, while the second supports *Grant*, *see* 556 S.W.3d at 878.

---

[11] *See also Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 427 (Tex. App.—Dallas 2019, pet. denied); *Kawcak v. Antero Res. Corp.*, 582 S.W.3d 566, 576 (Tex. App.—Fort Worth 2019, pet. denied).

[12] *See also Morgan v. Clements Fluids S. Tex., Ltd.*, 589 S.W.3d 177, 185 (Tex. App.—Tyler 2018, no pet.); *Abetecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL 3118601, at *8 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. denied).

We conclude that the *Gaskamp* line of cases is more harmonious with the TCPA as a whole. "Words in a vacuum mean nothing. Only in the context of the remainder of the statute can the true meaning of a single provision be made clear." *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1994). Again, the express purpose of the TCPA is to protect constitutional rights while simultaneously protecting plaintiffs' rights to file meritorious lawsuits for demonstrable injuries. *See* TEX. CIV. PRAC. & REM. CODE § 27.002. And the other two specific rights safeguarded by the TCPA—the right of free speech and the right to petition—have a public component as defined by the statute. *See id.* § 27.001(3)–(4). Construing "common interest" to include a public component is thus congruent with the statute as a whole. Accordingly, we hold that the "common interest" covered by the pre-2019 TCPA must relate to a matter of public concern.

Here, Champions claims that its conduct satisfies the statutory definition of "exercise of the right of association" because it joined with Comcast to promote their mutual business interests. But those mutual business interests do not qualify as "common interests" under the proper interpretation of the statute. As a result, we hold that Champions' conduct falls outside the scope of the right of association under the TCPA.

### III. Conclusion

In sum, we hold that Partners' suit against Champions is not based on, related to, or in response to Champions' exercise of either the right of free speech or the right of association. Accordingly, we hold that the TCPA does not apply to the legal action at issue and need not

23

address whether Partners met its evidentiary burden to survive dismissal under that statute.  We further express no opinion on the merits of Partners' claims.  Because we agree with the court of appeals that the trial court properly denied Champions' motion to dismiss, we affirm the court of appeals' judgment.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 30, 2023

24